[No. 8490.  Department Two.  April 2, 1910.]

ARCHIE R. GALBRAITH, *Appellant*, v. ADAM WEBER *et al.*,
*Respondents.*[1]

PRINCIPAL AND AGENT—AUTHORITY—SALE—APPARENT AUTHORITY TO FIX PRICE. Where the owner of a horse intrusted it to an agent to take to a place one hundred miles distant, where he had exclusive possession of the horse and certificates of its registration for six or eight weeks, for the purpose of selling it and making delivery to any purchaser he might find, it is a question for the jury to determine whether the agent was clothed with apparent authority to agree upon the price; and the fact that he first asked $3,000 and sold it for $1,000, is not sufficient to suggest to the purchasers that he was exceeding his authority.

SAME—APPARENT AUTHORITY TO TAKE NOTES. Where an agent was orally authorized to sell a horse in his possession, and take notes in payment, without any special instructions as to the form of the notes, it is for the jury to determine whether he had apparent authority to take notes payable to himself.

Appeal from a judgment of the superior court for Douglas county, Steiner, J., entered May 29, 1909, upon the verdict of a jury rendered in favor of the defendants, in an action of replevin. Affirmed.

[1]Reported in 107 Pac. 1050.

*Peacock & Ludden* and *M. B. Malloy*, for appellant.
*Arthur McGuire* and *Sam B. Hill*, for respondents.

Parker, J.—This is an action to recover possession of a
horse. There is involved the question of the authority of an
agent of plaintiff on making the sale of the horse to the de-
fendants. Upon a trial before the court and a jury, a ver-
dict was returned in favor of the defendants. Plaintiff's
motion for a new trial being denied, judgment was entered
upon the verdict. Plaintiff thereupon appealed to this court.

There is competent evidence tending to show the following
facts: The appellant resides near Spokane, and the respond-
ents reside near the town of Quincy, more than one hundred
miles distant from Spokane. Prior to this controversy ap-
pellant and respondents were entire strangers to each other.
Early in February, 1906, one W. C. Boquet came to Quincy
with the horse in his possession, and offered it for sale for
$3,000. He had in his possession, with the horse, two certi-
ficates of registration, one issued by the secretary of "The
American Shire Horse Association," the other issued by the
secretary of "The Shire Horse Society," of London, showing
the pedigree of the horse. Boquet exhibited the horse in and
about Quincy and continued his efforts to find a purchaser
for a period of six or eight weeks. Respondents knew of this
and then offered him $1,000 for the horse. Boquet then told
respondents that he hadn't authority to take $1,000; that he
would have to consult Mr. Galbraith; and that he would go
into town and telegraph to Galbraith. The next day he in-
formed respondents that he had a telegram from Galbraith
saying it would be all right to accept $1,000. The sale was
then consummated for that sum, on the 27th day of March,
1906. The horse, the two certificates of registration, and a
bill of sale, executed upon a form which Boquet evidently had
in his possession for that purpose, were delivered by him to
respondents. The bill of sale was signed "Archie R. Gal-
braith W. C. Boquet Agent." In payment of the horse, re-

spondents gave their two promissory notes for $500 each, payable to W. C. Boquet, which they delivered to him. The appellant never had any communication whatever with respondents until he visited Quincy a year later. The only knowledge respondents had concerning Boquet's authority was such as they might infer from the facts as above related.

We now turn to the facts occurring at the other end of the line. The horse being the property of appellant, was by him placed in the possession of Boquet for the purpose of taking it to Quincy to sell, where it was taken by Boquet as we have stated. Appellant also then gave to Boquet the two certificates of registration to be delivered to the purchaser. Appellant valued the horse at $3,000, and evidently desired to sell it for that sum, but it is not shown that Boquet was instructed by appellant to sell it for no less sum. Boquet was authorized to sell it on time and take good notes in payment. Appellant says Boquet was not authorized to sell it for cash, but we think the circumstances shown would warrant the jury in believing Boquet did have authority to sell it for cash.

Soon after the sale, Boquet returned to appellant at his home near Spokane and delivered to him three promissory notes for $900 each, purporting to be signed by respondents, Boquet representing they were given in payment of the horse. These were accepted by appellant, he believing them to be genuine, and no objection was made to the price. Appellant made inquiry by correspondence with banks where respondents were known and received favorable reports as to their financial worth. Soon thereafter Boquet disappeared. Appellant's counsel state in their brief that Boquet cashed or discounted the two $500 notes at a bank before disappearing, though the evidence does not clearly so show. This fact, however, is of little consequence, since it is not denied but that the notes have been paid or are still legal obligations against respondents. Upon the falling due of the first of the

$900 notes in March, 1907, they were discovered to be forgeries, and appellant then first learned of the sale of the horse for $1,000 and the giving of the two $500 notes to Boquet in payment thereof. Thereupon appellant visited respondents at Quincy and demanded the possession of the horse, claiming that Boquet had no authority to sell it for $1,000, and also that he had no authority to take the notes payable to himself.

Learned counsel for appellant assign error upon certain instructions given and refused by the trial court relating to general and special agency, and the exercising of apparent authority by an agent. Error is also assigned upon the court's refusal to direct a verdict in favor of appellant. The substance of counsels' contention upon these assignments, as we understand them, is that the evidence did not warrant the giving of any instruction upon the question of general agency, or upon the question of the exercise of apparent authority by an agent, and that the evidence does not support the verdict. It is argued that the evidence does not show that Boquet possessed the authority assumed by him in making the sale, and that his apparent authority was not such as to justify the respondents in dealing with him in the manner they did.

The difficulty in a case of this character is in applying the general rule of apparent authority to the facts of the particular case. From the foregoing statement of the facts, which the evidence tends to show and we think the jury were warranted in believing, it will be seen that this case presents a question of apparent authority in the agent, rather more than one of actual authority, so far as the question of price and manner of payment thereof are concerned. The authority to take the horse to Quincy for the express purpose of selling it to whomsoever Boquet could induce to buy it is conceded. The question of Boquet's apparent authority to agree upon the price and to receive payment by notes payable to himself are the questions concerning which we are to inquire as to whether or not the evidence was such as to make them

questions of fact for the jury. Let us first notice the general principles of law governing cases of this character. We find them well stated by Justice Wiswell in *Heath v. Stoddard*, 91 Maine 499, 40 Atl. 547, 549, as follows:

"A principal is not only bound by the acts of his agent, whether general or special, within the authority which he has actually given him, but he is also bound by his agent's acts within the apparent authority which the principal himself knowingly permits his agent to assume, or which he holds the agent out to the public as possessing. 1 Am. & Eng. Ency. Law (2d ed.), page 989, and cases cited.

"Whether or not a principal is bound by the acts of his agent, when dealing with a third person who does not know the extent of his authority, depends, not so much upon the actual authority given or intended to be given by the principal, as upon the question, what did such third person, dealing with the agent, believe and have a right to believe as to the agent's authority, from the acts of the principal. *Griggs v. Selden*, 58 Vt. 561; *Towle v. Leavitt*, 23 N. H. 360 (55 Am. Dec. 195); *Walsh v. Hartford Ins. Co.*, 73 N. Y. 5.

"For instance, if a person should send a commodity to a store or warehouse where it is the ordinary business to sell articles of the same nature, would not a jury be justified in coming to the conclusion that, at least, the owner had by his own act invested the person with whom the article was intrusted, with an apparent authority which would protect an innocent purchaser?

"In *Pickering v. Burk*, 15 East, 43, quoted by Mellen, C. J., in *Parsons v. Webb*, 8 Maine 38, Lord Ellenborough says: 'Where the commodity is sent in such a way, and to such a place as to exhibit an apparent purpose of sale, the principal will be bound and the purchaser safe.'"

Along the same line, in the text of 31 Cyc. 1333, we find the following:

"The apparent authority so far as third persons are concerned is the real authority, and when a third person has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority."

We will first notice Boquet's apparent power to fix the purchase price. Where the agent has exclusive possession of the property of his principal with authority and for the express purpose of selling it to any purchaser he may find, as in this case, we think a purchaser from such agent would clearly have the right to rely upon the agent having power to agree upon the purchase price. 2 Enc. L. & P. 1001; Mechem, Agency, § 362; 1 Clark & Skyles, Agency, § 245; *Bass Dry Goods Co. v. Granite City Mfg. Co.*, 119 Ga. 124, 45 S. E. 980.

It is argued that since Boquet had informed respondents, before the sale, that he did not have authority to sell the horse for $1,000, this was notice to them that he exceeded his authority in selling for that price. But this argument loses its force when we are reminded that Boquet told respondents the following day that he had a telegram from appellant saying it would be all right to accept $1,000. So after all, respondents had no information as to the price Boquet had authority to sell for, other than what Boquet himself told them. It is further argued that the great difference between $3,000, previously asked, and $1,000, finally accepted, was sufficient to suggest to respondents that Boquet was probably exceeding his authority. There is no evidence in the record to the effect that Boquet ever told respondents that he was not authorized to sell for less than $3,000. Indeed, the acceptance of the three $900 forged notes by appellant indicates that Boquet was authorized to sell for less than $3,000. All that Boquet ever said to respondents as to the limit of his authority was that he did not have authority to take $1,000, informing them the next day he did have such authority. It is true the appellant testified the horse was worth $3,000; but the jury were not required to believe it was worth that sum, especially in view of other testimony as to its earning power. So we do not think that these circumstances were so extraordinary as to enable us to say, as

a matter of law, they showed want of authority on the part of Boquet to agree upon a sale at $1,000.

We will now notice Boquet's apparent authority to receive notes in payment, payable to himself. We have seen that Boquet was clearly authorized to sell the horse on time and take payment in notes. We have no evidence of any special instructions as to the form in which the notes were to be made. In view of the conceded power of sale in Boquet as agent, and his exclusive possession of the horse for that express purpose, it would seem clear that respondents would have the right to regard him as also having authority to sell for cash and collect the purchase price. Mechem, Agency, § 338; 1 Clark & Skyles, Agency, § 239; 2 Enc. L. & P. 1003; 31 Cyc. 1358. We then conclude that the jury were fully warranted in believing that Boquet, so far as the rights of respondents are concerned, had authority to sell the horse and receive either cash or notes in payment.

Many authorities have been cited to the effect that power in an agent to sell does not give power to barter or exchange, or take notes in payment payable to the agent. We will notice two of these which are most favorable to plaintiff's contention. In the case of *Hoffman v. Hancock Life Ins. Co.*, 92 U. S. 161, cited by appellant, a note was taken by an insurance agent payable to himself, with other property, in payment of premiums, when he had no authority to receive anything but cash. It was held that such action on his part was without real or apparent authority, and the company was not bound thereby. That case we think differs from this in that the insurance agent had no power to accept anything but cash, while in this case the jury might believe from the evidence Boquet had power to accept either *notes* or *cash*. Counsel also cite *Baldwin v. Tucker*, 112 Ky. 282, 65 S. W. 841, 57 L. R. A. 451. That case is apparently much like this and, were we inclined to follow it, would serve as authority here. The decision, however, was rendered by a divided court, decided by four justices as against three dissenting. It

involved the taking of a note in payment of a piano by an
agent, payable to himself, and not thereafter accounted for
to his principal.   The piano appears to have been in pos-
session of the agent for the purpose of sale at the time of the
sale and delivery by him.   The question was as to whether or
not the act of the agent in taking the note, payable to him-
self, was sufficient to warrant the court in taking the case
from the jury and deciding as a matter of law that the
agent exceeded his apparent authority.   The majority held
that it was.   We are impressed, however, with the remarks of
Justice Hobson, in his dissenting opinion, concurred in by
two of his brethren, as follows:

"No authority can be found for the proposition, so far as
I am aware, that the taking of a note by an agent in his
own name is, as a matter of law, conclusive to the purchaser
that the agent is exceeding his authority. . . . As between
two innocent persons, one of whom must suffer, the loss
should fall on the principal who has armed the agent with
apparent authority, and thus enabled him to obtain the ad-
vantage of the person with whom he trades, rather than on the
purchaser, where the agent acts within the apparent scope of
his authority, and there is nothing in the transaction to put
the purchaser on notice that he is exceeding his authority.
Where authority is conferred by parol the rule is that the
apparent scope of it is a question for the jury.   It seems to
me the same rule should be applied where the agent is sent
to take charge of his principal's interest in a territory distant
from his principal, and the secret arrangements between the
principal and the agent are unknown to the public dealing
with him."

Like the learned dissenting justice in that case we have
had no authority called to our attention to the effect that the
mere taking of a note by a sales agent, payable to himself, in
payment upon a sale made by him of property in his exclusive
possession for the purpose of sale and delivery, authorizes
the taking from the jury the question of the agent's apparent
authority in so doing.   The case of *Scleicher v. Armstrong*,
(Tex. Civ. App.), 32 S. W. 327, supports this view, though

the question does not seem to have been elaborately discussed. It may be conceded that where an agent has authority to sell for cash only, he cannot take payment in notes payable in the future, either to himself or the principal, and it may be also conceded that where the agent has authority to sell upon credit only, he is not authorized to take such credit except in the name of his principal. We mean such authority as a purchaser is bound to notice. This case presents a different situation, since the jury would be fully warranted in believing that Boquet had authority to take either notes or cash in payment, as we have seen. The only sound reason that can be assigned for prohibiting the giving of notes payable to Boquet for this horse, is that by so doing it placed within his power the ability to convert such notes to his own use and defraud his principal. This reason might apply if Boquet was, at the time of the sale, without authority to sell for cash; but since the evidence was such that the jury might believe he had the authority to receive cash as well as notes in payment, it at once becomes plain that respondents, by giving notes payable to Boquet, were not thereby placing it in his power to defraud his principal any more than as if they had paid him in money.

In view of the power of sale vested in Boquet; the fact that he had exclusive possession of the horse for that express purpose; the fact that the transaction occurred a hundred miles or more distant from the residence of the owner, the owner not being present at any time during the whole six or eight weeks his agent was attempting to make the sale; the fact that respondents and appellant were entire strangers to each other; the fact that Boquet had also in his possession certificates of registration showing the pedigree of the horse, ready for delivery with the horse to whomsoever he might sell, leads us to the conclusion that the jury were warranted in believing from all the circumstances that Boquet was acting within his apparent authority, as respondents had a right to view it.

We are of the opinion that the evidence was not such as to enable the court to dispose of the question of Boquet's apparent authority as a matter of law, and that the cause was properly left to the jury. The judgment is affirmed.

RUDKIN, C. J., MOUNT, CROW, and DUNBAR, JJ., concur.