## STANDARD BANK OF CANADA v. LOWMAN et al. (three cases).

(District Court, W. D. Washington, N. D. October 24, 1924.)

Nos. 150-152.

**1. Banks and banking ⚖=179—Under Canadian statute, innocent purchaser for value of warehouse receipts held to have title to goods as against pledgee bank.**

Bank Act Canada, 3-4 Geo. V, c. 9, §§ 88, 89, does not vest in bank fee title to goods pledged with it to secure loan, and on pledgor's removal of such goods to United States with bank's consent, innocent purchasers of warehouse receipts for value obtained title thereto.

**2. Warehousemen ⚖=12—Cases of canned salmon held "fungible" goods, and warehouse receipts for specified number of cases out of larger mass were valid.**

Under Rem. Comp. Stat. Wash. 1921, § 3644, cases of canned salmon are fungible goods, each unit of which is equal to others, and under section 3609 warehouse receipts for specific number of cases out of larger mass is valid.

**3. Warehousemen ⚖=12—Requisites of warehouse receipts stated.**

Under Rem. Comp. Stat. Wash. 1921, § 3588, warehouse receipt need not be of particular form, but must show location of warehouse, date of issue, consecutive number of receipt, whether goods shall be delivered to

bearer, or named person, or his order, rate of storage charges, description of goods or package containing them, signature of warehouse, warehouseman's interest, if any, statement of advances or incurred liability, etc.

**4. Warehousemen ☞17—Under Washington statutes, pledgees of warehouse receipts held holders for "value."**

Where salmon pledged to secure loan by Canadian bank were, with bank's consent, shipped to United States by pledgor under bill of lading not containing words "nonnegotiable," bill was negotiable under Rem. Comp. Stat. Wash. 1921, § 3657, and subsequent pledgees of warehouse receipts were innocent holders for value; "value" being anything that will support simple contract.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Value.]

**5. Banks and banking ☞179 — Canadian pledgee, by intrusting goods to pledgor for shipment to United States, represented that title was in pledgor.**

Canadian bank, by intrusting pledgor of salmon securing loan with salmon for shipment to United States, represented that title was in pledgor, and pledgor's negotiation of warehouse receipts to purchaser for value without notice precludes bank from questioning purchaser's title, irrespective of Canadian Bank Act.

**6. Banks and banking ☞179—Under Canadian statutes, pledgee of goods to secure loan had "security title," and pledgor had "residue ownership title."**

Under Bank Act Canada, 3–4 Geo. V, c. 9, §§ 88, 89, where salmon was pledged to bank to secure loan, bank had "security title," which did not have any extraterritorial force as against innocent purchasers for value in foreign jurisdiction, and pledgor had "residue ownership title," and bank having consented to removal of salmon to state of Washington, property was thereby submitted to law of that jurisdiction.

At Law. Three separate actions by the Standard Bank of Canada against W. A. Lowman and others. Judgments for defendants.

The issues involved in each of the above-entitled cases are the same, except as to the particular defendants and the number of cases of salmon involved, and for all purposes herein the cases will be treated together. The plaintiff alleges:

That it is a chartered bank of the Dominion of Canada, under the Bank Act of Canada, having a branch office in the city of Vancouver, B. C. That the defendants Coast Fish Company and Kelley-Clarke Company are incorporated under the laws of the state of Washington, and the Seattle National Bank organized under the National Banking Act of the United States and doing business in Seattle. That W. A. Lowman is a citizen and resident of Anacortes, Wash. That the Bank of California, N. A., is a citizen of the United States, organized under the laws of the state of California, and having a branch office and one of its principal places of business in Seattle, Wash. That at all the times mentioned in the complaint there was in force throughout the Dominion of Canada the Bank Act entitled: "The Bank Act Canada, 3–4 George V, chapter 9, an act respecting banks and banking; assented to 6th June, 1913, came into effect 1st July, 1913." That the plaintiff is governed by and its business conducted under and determined by such act. That section 86 of said act provides:

"1. The bank may acquire and hold any warehouse receipt or bill of lading as collateral security for the payment of any debt incurred in its favor, or as security for any liability incurred by it for any person, in the course of its banking business.

"2. Any warehouse receipt or bill of lading so acquired shall vest in the bank, from the date of the acquisition thereof,—

"(a) All the right and title to such warehouse receipt or bill of lading and to the goods covered thereby of the previous holder or owner thereof; or

"(b) All the right and title to the goods, wares and merchandise mentioned therein of the person for whom such goods, wares and merchandise were received or acquired by the bank, if the warehouse receipt or bill of lading is made directly in favour of the bank, instead of to the previous holder or owner of such goods, wares and merchandise."

That section 88 of said Bank Act provides:

"1. The bank may lend money to any wholesale purchaser or shipper of or dealer in products of agriculture, the forest, quarry and mine, or the sea, lakes and rivers, or to any wholesale purchaser or shipper of or dealer in live stock or dead stock or the products thereof, upon the security of such products, or of such live stock or dead stock or the products thereof.

"2. The bank may lend money to any person engaged in business as a wholesale manufacturer of any goods, wares and merchandise upon the security of the goods, wares and merchandise manufactured by him, or produced for such manufacture. * * *

"5. Any such security as mentioned in the foregoing provisions of this section may be given by the owner of said products, goods, wares and merchandise, stock or products thereof, or grain.

"6. The security may be taken in the form set forth in Schedule C to this act, or to the like effect.

"7. The bank shall, by virtue of such security, acquire the same rights and powers in respect to the products, goods, wares and

merchandise, stock or products thereof, or grain covered thereby as if it had acquired the same by virtue of a warehouse receipt: Provided, however, that the wages, salaries, or other remuneration of persons employed by any wholesale purchaser, shipper, or dealer, by any wholesale manufacturer, or by any farmer in connection with any of the several wholesale business referred to, or in connection with the farm, owing in respect of a period not exceeding three months shall be a charge upon the property covered by the said security in priority to the claim of the bank thereunder and such wages, salaries, or other remuneration shall be paid by the bank if the bank takes possession or in any way disposes of the said security or of the products, goods, wares and merchandise, stock or products thereof, or grain covered thereby."

That section 89 of said act provides:

"If goods, wares and merchandise are manufactured or produced from the goods, wares and merchandise, or any of them, included in or covered by any warehouse receipt, or included in or covered by any security given under the last preceding section, while so covered, the bank holding such warehouse receipt or security shall hold or continue to hold' such goods, wares and merchandise during the process and after the completion of such manufacture or production, with the same right and title, and for the same purposes and upon the same conditions, as it held or could have held the original goods, wares and merchandise."

It is then alleged that W. A. Lowman was the president of the C. L. Packing Company, Limited, and F. T. Cliff its secretary; that this company was organized under the laws of British Columbia, and that the president and secretary, pursuant to resolution of the board of directors, executed the written security pleaded of such corporation under section 88 of the Bank Act, and promised to give warehouse receipts or security as set forth in the exhibits attached to the complaint and executed for advancements made to this corporation by the bank, two promissory notes, one dated October 29, 1918, in the sum of $50,000, due December 2, 1918, and one dated November 13, 1918, in the sum of $25,000, and due December 16, 1918. The property covered in the security given consisted of cans, canned salmon, and supplies used in canning salmon, then in Lighthouse cannery at Steveston, and Green Bay cannery Jervis Inlet, all in British Columbia; that no part of the indebtedness has been paid; that part of the

salmon situate in the canneries and included in and covered by the security given was 14,580 cases of chum salmon, one pound talls, manufactured by the C. L. Packing Company, Limited. It is then alleged that on about the 1st of May, 1920, and on or about the 22d of May, 1920, said salmon was, by the C. L. Packing Company, Limited, shipped in bond to Anacortes, Wash., and placed in bond in the warehouse of the Coast Fish Company of Anacortes; that Will A. Lowman was president of the Coast Fish Company, and that Lowman acknowledged in writing that said salmon had been taken into the warehouse of the Coast Fish Company for the account of the C. L. Packing Company, Limited, that the Coast Fish Company knew that the plaintiff had advanced $75,000 on the salmon; that on August 16, 1920, a further warehouse receipt covering the salmon was issued by the Coast Fish Company, by Will A. Lowman, its president, to the Standard Bank of Canada.

It is then alleged that the plaintiff is advised that the defendants, with knowledge of the plaintiff's rights, appropriated and converted certain cases of the salmon and wrongfully removed the same from the place of storage, and sold and disposed of the same, and appropriated the purchase price and converted the salmon so removed and the proceeds thereof to their own use; that written demand has been made on the defendant Kelley-Clarke Company and the defendant banks for the salmon, and demand has been made of Will A. Lowman and the Coast Fish Company. Judgment is then prayed against each of the defendants for the value of the salmon, with interest upon various sums from various dates.

The defendant Kelley-Clarke Company admits its corporate existence and the corporate existence of the other defendant corporations; admits that 14,500 cases of salmon were shipped to Anacortes and placed in bond in the Anacortes Warehouse Company; admits that the defendant Lowman is the president of the Coast Fish Company since its organization; admits that the salmon was sold for the price stated in the plaintiff's complaint, and that demand has been made for the salmon and the price; denies either directly or on information and belief every other allegation of the complaint; and alleges as a first affirmative defense that in December, 1919, the Coast Fish Company and Will A. Lowman executed to the order of the named banks their promissory notes, promising to pay on demand certain sums together with interest. Simul-

tanenously with the execution of the notes, to secure the payment thereof, the Coast Fish Company and Will A. Lowman pledged to the banks warehouse receipts issued by the Anacortes Warehouse Company, duly indorsed, covering 30,415 cases of salmon. The warehouse receipts were numbered and dated, with the number of cases of salmon covered by each warehouse certificate, setting out the numbers of the warehouse receipts.

It is further alleged that it was agreed between the parties that the banks should hold the warehouse receipts as a pledge and collateral security for the payment of the total indebtedness to each, with interest; that upon the delivery of said notes and the warehouse receipts the banks paid over to the Coast Fish Company the full sums borrowed; that it was represented to the banks by Lowman and the Coast Fish Company that the Coast Fish Company and Lowman were the owners of the warehouse receipts so pledged and the salmon described therein; that the banks had no knowledge or information that the warehouse receipts or salmon covered thereby were claimed in whole or in part by any other party, and that when the various parcels of salmon covered by said warehouse receipts were sold by the Coast Fish Company through Kelley-Clarke Company, one of the defendants, the proceeds were paid to the banks and applied upon the liquidation of the indebtedness; that the total payments made to the banks are named sums; that the banks thereafter sold the notes and the warehouse receipts covering the unsold salmon to Kelley-Clarke Company, one of the defendants, and Kelley-Clarke Company paid to the banks therefor the full unpaid sums on such loans, and upon such payment the notes and the warehouse receipts were delivered by the banks to Kelley-Clarke Company; that the Kelley-Clarke Company had no knowledge or information that any third party claimed any interest in or lien upon any of the salmon described in the warehouse receipts at the time it purchased said notes and took over the warehouse receipts from the banks; that the warehouse receipts were negotiable, issued by the Anacortes Warehouse Company; that in making the sales of the salmon the Kelley-Clarke Company was acting as a broker for the Coast Fish Company and Will A. Lowman; that actual possession of the salmon was taken over by the Kelley-Clarke Company, and sold and the proceeds applied at the given dates.

And for a second affirmative defense the Kelly-Clarke Company alleges that the salmon was removed from British Columbia at given dates and stored in the warehouse of the Anacortes Warehouse Company at Anacortes, Wash., by the Coast Fish Company and Will A. Lowman, who represented to the banks and the Kelley-Clarke Company that they were the absolute owners of the salmon, and that the salmon was free and clear of liens of all kinds; no lien or mortgage of any kind was ever filed in the auditor's office of Skagit county where the salmon was located, no constructive notice of any character was ever given to the banks or the Kelley-Clarke Company; that the loans were made and the money paid on the loans, and the warehouse receipts given, without any knowledge that any one claimed any interest in the salmon; that the salmon was transported by the C. L. Packing Company Limited, to the state of Washington and deposited in the warehouse of the Anacortes Warehouse Company with the consent and knowledge of the plaintiff, and it was thereby made possible for the Coast Fish Company and Will A. Lowman to borrow money from the banks, and that the plaintiff permitted the same to remain in the warehouse at Anacortes without taking any steps to assert any lien or claim upon the said salmon until May, 1921; that the plaintiff knew that the Kelley-Clarke Company was engaged in the brokerage business and was the broker for the Coast Fish Company and Will A. Lowman in the sale of the salmon, and that that knowledge continued from the time that the salmon was stored in the Anacortes Warehouse Company.

In the third affirmative defense it is alleged that in November, 1919, the C. L. Packing Company, Limited, with the consent of the plaintiff, substituted for the 14,580 cases of chum salmon 10,500 cases of pink salmon, and the plaintiff accepted the pink salmon in lieu of the chum salmon; that the pink salmon at the time was worth more than $90,000, a sum in excess of the entire indebtedness due to the plaintiff; that the plaintiff was requested to sell the pink salmon and liquidate the indebtedness, and that if sold, and the proceeds applied, the entire indebtedness would have been liquidated; that the bank had the possession of the pink salmon, absolute authority and control, and sole power to make sale, but it declined and refused to do so, and failure to make the sale at the time has greatly reduced the value, and plaintiff is now estopped from

asserting any claim to salmon other than the pink salmon.

For a fourth affirmative defense the Kelley-Clarke Company says that the indebtedness to the bank has been fully paid.

Each of the banks files an answer in substance similar in import to the answer of the Kelley-Clarke Company.

Will A. Lowman answers, admitting corporate relation of the several corporations; denies that there is any indebtedness due from the C. L. Packing Company to the plaintiff; admits 14,580 cases of salmon were shipped from British Columbia to the state of Washington; admits that he is the president of the Coast Fish Company; denies that there was any warehouse receipt issued by him as president of the Coast Fish Company to the plaintiff bank, that he gave a writing stating that the salmon was taken to the United States in order to help out the manager of the plaintiff bank, and that the instrument was not given as a warehouse receipt, and that the instrument offered in evidence contains matter which was not in the paper when he signed it.

The answer of the Coast Fish Company in import is similar to, and in harmony with, the allegations and denials contained in the answers of the other defendants.

The plaintiff, replying to the answers of the several defendants, in substance denies that the salmon was stored in the Anacortes Warehouse Company, and that the pink salmon referred to in the answer was worth more than $30,389.80; says that the pink salmon was held as security for a $30,000 loan which was distinct from the $75,000 loan; denies that the pink salmon was substituted for the chum salmon; and denies all other allegations of the several answers out of harmony with its complaint.

The record is conclusive that the 14,580 cases of Canadian chum salmon were shipped from British Columbia to Anacortes with the consent and permission of the plaintiff and that W. A. Lowman was president of the Coast Fish Company, the Anacortes Warehouse Company, and the C. L. Packing Company, Limited. The Coast Fish Company was a creditor of the C. L. Packing Company and advanced further sums and was going to finance it for the following fishing season. I think it is shown that at the time the salmon was removed from British Columbia to Anacortes the C. L. Packing Company, Limited, had assets of the approximate value of from $100,000 to $150,000; that Lowman and Cliff were solvent, and each had guaranteed the indebtedness to plaintiff bank; and that the bank at that time considered Lowman's guaranty good. The Coast Fish Company was solvent. Lowman was the dominating influence in these several corporations. The 10,500 cases of pink salmon pledged for a $30,000 loan, were also to be held as security for the other indebtedness, and were at the time worth from $90,000 to $100,000. I think the testimony has established beyond any question that all of the transactions and relations of W. A. Lowman with relation to the matters in issue were acts on behalf of the respective corporations of which he was president, whether official designation appears or not, except as to his personal indorsement, maker or guarantor of the promises to pay disclosed in the record. The Lowman family owned half of the stock of the C. L. Packing Company, Limited, and Cliff and his wife owned the other half. The $75,000 indebtedness was created for the purpose of financing the indebtedness that then existed against the company.

About the time of the removal of the salmon in issue from British Columbia to Anacortes the salmon market was depressed. It was considered by the plaintiff and the C. L. Packing Company, Limited, that it would be advantageous to remove the salmon to the United States because of better opportunity to dispose of it. It was pursuant to such conclusion that the salmon was shipped to Anacortes. I think the testimony establishes, with all of the circumstances, the relation and status of the parties as then understood by each; that the salmon was to be disposed of by the Coast Fish Company as the representative of the bank. At the time the plaintiff bank had confidence in Lowman, and gave him practically a "free hand." The salmon was shipped from British Columbia to Anacortes, consigned to W. A. Lowman and or/the Coast Fish Company. It was received by the Coast Fish Company and stored in the Anacortes Warehouse Company, and warehouse receipts issued. These warehouse receipts were thereafter hypothecated by Lowman and the Coast Fish Company with the Seattle National Bank, Kelley-Clarke Company, and likewise with the Bank of California.

The plaintiff bank did not know that the warehouse receipts had been issued by the Anacortes Warehouse Company or that they had been hypothecated as hereinabove indicated. No evidence of title, conditional title, or security title was ever filed by the plaintiff bank in the office of the county auditor of Skagit county, the county in which

the salmon remained until disposed of by the Kelley-Clarke Company as the broker and agent of the Coast Fish Company. The conduct of the parties, and their acts and relations at the time of the transaction and for many months thereafter, are in the main in harmony with relation to the transaction. It is only when there was default in the report of sales and remittance, when the contradictory conduct and expressions appear.

The statements of the several parties subsequently made must all be considered with relation to the conduct of the parties at the time, the financial relation and status, the object to be attained, the end to be reached by all, and the confidence reposed in Lowman by the bank. When these are all considered I am satisfied that, when the salmon was shipped from British Columbia by the C. L. Packing Company, Limited, to the Coast Fish Company and/or W. A. Lowman, that the latter was authorized and empowered, if not expressly then impliedly, to take the salmon and dispose of it—given practically a free hand to sell, and remit the proceeds to the plaintiff. From the testimony and conduct of the parties I do not think that pink salmon was substituted for the chum salmon, but do think that, if the plaintiff had sold the pink salmon in the early part of 1920, when Lowman produced a purchaser, at $7 or $7.50 a case, the indebtedness would have been greatly reduced. What, if any, relief the defendant fish companies have cannot be determined here, this being an action for conversion.

Hadley & Abbott, of Bellingham, Wash., for plaintiff.

Thomas Smith, of Mt. Vernon, Wash., for defendants Lowman and Coast Fish Co.

Kerr, McCord & Ivey, of Seattle, Wash., for defendants Kelley-Clarke Co., Seattle National Bank, and Bank of California, N. A.

NETERER, District Judge (after stating the facts as above). The issues in the instant cases are of fact and law, tried before the court, a jury having been waived. From no point of approach can I conclude that the plaintiff has sustained the burden of proof resting upon it, and where the burden rests upon the defendants to the extent as herein stated, I believe it has been sustained.

The plaintiff, without doubt, consented to the removal of the salmon by the C. L. Packing Company, Limited, from British Columbia to Anacortes, Wash. I believe it to have been the understanding between the plaintiff bank and the C. L. Packing Company,

Limited, and the defendants Coast Fish Company and W. A. Lowman, that the Coast Fish Company and Lowman, as its president, were to dispose of the salmon. At the time of the removal Lowman was considered good on his guaranty, and the Coast Fish Company was solvent and reputed to be worth a considerable sum of money. The 10,500 cases of pink salmon had a much greater value than the amount of the special separate loan. The C. L. Packing Company, Limited, likewise was possessed of considerable assets over and above its liabilities. In view of these circumstances and the conduct of the parties, and the object to be attained, the removal, the conclusion is inevitable, in the light of the testimony, that such was the understanding.

[1] The Bank Act of Canada does not vest in the bank fee-simple title to the salmon. The transfer of the salmon, with the bank's consent, from Canada to the United States by the C. L. Packing Company, Limited, consigned to the Coast Fish Company and/or W. A. Lowman, subjected the lien of the bank to the claim of purchasers for value. The warehousing of the salmon by the Coast Fish Company with the Anacortes Warehouse Company, and the issuing of warehouse receipts, carried title to innocent purchasers and holders of the warehouse receipts for value.

[2, 3] The salmon in issue were fungible; i. e., each unit was "the equivalent of any other unit." Section 3644 (3369—58) Rem. Comp. Stat. Wash. And the warehouse receipt for a specific number of cases out of a larger mass is valid. Section 3609 (3369—23), supra. The warehouse receipt need not be of particular form, but must contain a statement of the location of the warehouse, date of issue, consecutive number of receipt, whether goods shall be delivered to bearer or named person or his order, rate of storage charges, description of goods or package containing them, signature of the warehouse, interest, if any, of warehouseman, statement of advances or incurred liability, etc. Section 3588 (3369—2), supra; Laube, Trustee, v. Seattle Nat. Bank (Wash.) 228 P. 594. The testimony establishes that the warehouse receipts substantially comply with the requirements. See Smith Bros. Co. v. Richheimer & Co., 145 La. 1066, 83 So. 255; New Jersey Title Guarantee & Trust Co. v. Rector, 75 A. 931; Manufacturers' Mercantile Co. v. Monarch Refrigerating Co., 266 Ill. 584, 107 N. E. 885; Klock Produce Co. v. Diamond Ice Co., 90 Wash. 67, 155 P. 414.

[4] A warehouse receipt may be negotiated by the owner or person to whom possession has been intrusted by the owner. Section 3626 (3369—4) Rem., supra. And the person to whom negotiated acquires such title to the goods as the party negotiating it had or the ability to convey to a purchaser in good faith for value. Value is anything that will support a simple contract. The Seattle National Bank and the Bank of California unquestionably were innocent holders for value, and no other conclusion is warranted as to Kelley-Clarke Company. The salmon were shipped with plaintiff's consent from British Columbia to Anacortes and consigned to "the Coast Fish Company and/or Will A. Lowman or assignees." The bill of lading did not contain the words "nonnegotiable," and was therefore negotiable. Section 3657, Rem., supra; State Bank v. N. B. Co., 87 Wash. 142, 151 P. 253. The C. L. Packing Company, Limited, was authorized by the plaintiff bank to ship the salmon to Anacortes. The shipping, warehousing, and taking warehouse receipt were lawful.

[5, 6] Intrusting the C. L. Packing Company, Limited, with the salmon to ship to the United States, and the Coast Fish Company with the warehousing of the same, as disclosed, is a representation of title in the Coast Fish Company and/or W. A. Lowman, and the negotiation of the warehouse receipt to a purchaser for value, without notice, precludes the plaintiff bank from questioning the title of the defendant banks. Com. Bank v. Canal Bank, 239 U. S. 520, 36 S. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25. This is so, irrespective of the Bank Act of Canada. Com. Bank Case, supra. Under the Bank Act, supra, the plaintiff did not have fee-simple title. Neeson v. Smith, 47 Wash. 386, 92 P. 131; O'Reilly v. Tillman, 111 Wash. 594, 191 P. 866; Jones v. North Pac. Fish & Oil Co., 42 Wash. 332, 84 P. 1122, 6 L. R. A. (N. S.) 940, 114 Am. St. Rep. 131. The title bore a dual relation. Each relation had an insurable right. Falconbridge on Banking and Bills of Exchange, p. 245; Parsons v. Queen Ins. Co., 29 U. C. C. 188; B. C. Hop Co. v. Fidelity-Phœnix Fire Ins. Co., 20 B. C. Law Rep. 165. The plaintiff bank had "security title," and the fish company "residue ownership" title. In re Richheimer, 221 F. 16. The plaintiff bank's title had no extraterritorial force as against innocent purchasers for value in a foreign jurisdiction, and its claim is barren of any equities as against the defendant banks and the Kelley-Clarke Company; residue ownership being in the C. L. Packing Company, Limited, consenting to the disposition. The plaintiff, the holder of the "security title," having consented to the removal of the salmon to the state of Washington, the property was thereby submitted to the regulations of this jurisdiction. Geiser Mfg. Co. v. Todd (Mo. App.) 204 S. W. 287; Carroll v. Nisbet, 9 S. D. 497, 70 N. W. 634; State Bank v. Sutherlin, 93 Neb. 707, 141 N. W. 827, Ann. Cas. 1914B, 1250, 46 L. R. A. (N. S.) 95; Hervey v. R. I. L. Wks., 93 U. S. 664, 23 L. Ed. 1003; Pullman Car Co. v. Penn., 141 U. S. 18, 11 S. Ct. 876, 35 L. Ed. 613; Dooley v. Pease, 180 U. S. 126, 21 S. Ct. 329, 45 L. Ed. 457; In re Richheimer, supra.

There was no unlawful conversion, and judgment is directed for defendants. Caughren v. Kahan, 86 Wash. 361, 150 P. 445; Galbraith v. Weber, 58 Wash. 132, 107 P. 1050, 28 L. R. A. (N. S.) 341.