[No. 19044. Department One. April 28, 1925.]

R. HAVERTY, *Respondent*, v. INTERNATIONAL STEVEDOR-ING COMPANY, *Appellant*.[1]

MASTER AND SERVANT (20½)—LIABILITY FOR INJURIES—WHAT LAW GOVERNS—MARITIME SERVICE. The work of a stevedore in the hold of a ship, stowing away cargo loaded at a dock, is maritime in its nature, governed by the Federal statutes.

SEAMEN (1)—WHO ARE SEAMEN—STEVEDORES. A stevedore in the hold of a ship, stowing away cargo loaded at a dock, is not a seaman, within the act of March 4, 1915 (41 St. L. 1007), providing that in suits for any injury sustained on board vessel or in its service "seamen having command" shall not be held to be fellow servants with those under their authority.

MASTER AND SERVANT (76)—FELLOW SERVANTS AND VICE PRINCI-PALS—SIGNALS OR WARNINGS. The fellow servant rule having been adopted by the admiralty courts from the common law, in an action for personal injuries sustained in maritime service by a stevedore, at work in the hold stowing away cargo, it must be held that a hatch tender whose duty it was to give warning to those below, who were unable to protect themselves, is a vice-principal and not a fellow servant of the plaintiff.

SAME (130)—ACTIONS—PRESUMPTIONS AND BURDEN OF PROOF—NONDELEGABLE DUTIES. Where the master is shown to have failed in his nondelegable duty to give warning to workmen in the hold of a vessel, of the lowering of a sling load of cargo, the burden is upon him to show that the load was dropped without fault of the hatch tender whose duty it was to give the warning.

Appeal from a judgment of the superior court for King county, Hall, J., entered August 15, 1924, upon the verdict of a jury rendered in favor of the plaintiff,

[1]Reported in 235 Pac. 360; 238 Pac. 581.

for personal injuries sustained by a stevedore while loading a ship, after a trial on the merits.   Affirmed.

*Stephen V. Carey* and *Roy E. Bigham,* for appellant.

*Mark M. Litchman,* for respondent.

*Bogle, Bogle & Holman, Huffer, Hayden, Merritt, Summers & Bucey, Grosscup & Morrow, William H. Gorham,* and *G. F. Vanderveer, amici curiae.*

TOLMAN, C. J.—Respondent, as plaintiff, brought this action to recover for personal injuries, and from a verdict in his favor for $3,500 and a judgment thereon, the defendant has appealed.

By his original complaint, the respondent alleged that, on May 31, 1923, he was employed as a stevedore by the appellant, and engaged in loading wool in the hold of the steamship Andrea Luckenbach, in Seattle harbor; and while so engaged was injured through the negligence of the winchman, who carelessly and without warning lowered a load of wool into the hold, striking the respondent, who was then engaged in stowing away the previous load, and causing the injuries complained of.   In that complaint, after describing the apparatus in use, it was alleged that the winch driver was in sole control of the operations; that it was his duty to lower no load until the previous load had been taken away; to watch the process and to notify or signal the respondent when a load was to be lowered; and the negligence complained of is that "said winch driver, without any warning to plaintiff, carelessly and negligently dropped another load of wool . . . on the head and back of this plaintiff."

Thereafter, and before trial, an amended complaint was filed, leave of court having been first obtained, in which it was alleged that the winch was operated by a winch driver under the control and direction of a

hatch tender, who was in the employ of the appellant, as vice-principal, and that the hatch tender had control, superintendence and direction of the winch and the operation thereof, which he exercised by giving signals and commands to the winch driver and others, and that it was his function and duty to superintend and control the loading of the sling, the lowering of its load into the hold, and to signal those engaged in the hold in stowing away the cargo; and that it was the duty of the hatch tender to signal to the respondent and those engaged with him in the hold before any load was lowered, and only after giving such signal to direct the winch driver to lower the load; so that, in the amended complaint, the negligence alleged was that of the hatch tender and not that of the winch driver, as was charged in the original complaint. The appellant answered the amended complaint with appropriate admissions and denials, and affirmatively pleaded the defenses of contributory negligence, assumption of risk and fellow servant.

The facts are but little in dispute, the controlling questions being whether the maritime law governs; and, if so, whether the evidence justifies a holding, as a matter of law, that the hatch tender was the fellow servant of the respondent.

In order to clearly understand the questions thus raised, the facts as shown by the testimony must be stated with some detail. It appears that the hatch is twenty-four by twenty-one feet, surrounded by a hatch coaming something like sixteen inches high. The winches are placed just forward of the hatch and the winch driver stands at these winches to operate the levers. From his position he can see into the hatch, but not all around it, as the angle of vision from his position hardly permits a full view of the bottom of the hatch. The respondent and his fellow laborers

were employed at the bottom of the ship, some forty or fifty feet below the deck upon which the winches stood and where the winch driver and the hatch tender had their stations. It was the duty of the hatch tender to see to the gear, have everything in order, and direct the operations.

The loading operations in progress when the accident occurred were carried on in this wise: A sling, attached to a boom, was deposited upon the dock, in which was placed a load of four bales of wool, each bale weighing from four hundred to five hundred pounds, and the total load weighing from sixteen hundred to two thousand pounds. The hatch tender, standing near the rail of the vessel, supervised the fastening of the sling, and when it was loaded and in order, it was his duty to give a signal to the winch driver to raise the sling and carry its load over and above the hatch, ready for lowering. It was then the duty of the hatch tender to step to the hatch, look over the coaming into the hold, observe if the previous load had been disposed of, and then give a warning to the men engaged below by calling out, "Look out below," or words to that effect; and thereupon, and not until then, to give the winch driver directions to lower the load into the hold. The men thus warned stood back from the open hatchway until the load came within their reach, when they swung or pushed it into position to be released and deposited. The sling was then carried up by the operation of the winch and the process repeated.

With reference to the particular load which caused the injury, the evidence, so far as it goes, is undisputed; but that evidence fails to show whether the load was lowered by the order of the hatch tender or whether it was lowered by the winch driver without any such order. But lowered it was, without any

warning to those engaged below, and at the time the respondent was in a stooping position, bending over the previous load in the discharge of his duties, and the descending load struck him upon the back, causing his injuries, the extent and nature of which need not now be described.

Appellant seems to contend that the winch driver was clearly the fellow servant of the respondent, and that, considering the state of the testimony just mentioned and the lack of evidence going to show that the hatch tender directed the load to be lowered, the jury should not be permitted to speculate as to which was at fault.

It is further contended, also, that the hatch tender was the fellow servant of the respondent, and even if there was evidence that the hatch tender was at fault, still no substantial recovery could be had.

Upon the other hand, respondent puts forth the contention that he was entitled to a safe place in which to work; that it is clearly shown that it was the duty of the hatch tender to give him a warning signal before any load was lowered; that the hatch tender was a vice-principal performing a nondelegable duty in that respect; and that the failure to cause such a signal to be given was such negligence as entitles him to recover.

The work of a stevedore, in which the respondent was engaged at the time he received the injuries which gave rise to this action, is maritime in its nature. His employment was a maritime contract, the injuries were likewise maritime injuries, and his rights must be determined by maritime laws. *Atlantic Transport Co. v. Imbrovek,* 234 U. S. 52.

Admitting that the maritime law applies, respondent first calls attention to the act of Congress of 1915, U. S. Compiled Statutes, 1918, § 8337a, which reads:

"In any suit to recover damages for any injury sustained on board vessel or in its service seamen having command shall not be held to be fellow servants with those under their authority." 38 Stat. L. 1185. And the amendment of 1920 (Fed. Stat. Ann.—1920 Supp., page 227) which reads:

"Sec. 33. That section 20 of such Act of March 4, 1915, be, and is, amended to read as follows:

" 'Sec. 20. That any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.' " 41 Stat. L. 1007.

The first of these enactments was upheld by the Federal supreme court in *Panama Railroad Co. v. Johnson*, 264 U. S. 375, 68 Law Ed. 748, in an exhaustive and able opinion. True, in that case the injured person was a seaman and the injury was sustained while the ship was at sea; while here the injured person was a stevedore and received his injuries while on board a ship in port. But it seems to us that Congress intended to legislate in favor of all those whose occupations render them subject to maritime injuries and used the term "those" (held to mean seamen as hereinafter related) in the first act, and the word "seamen" in the second act, as broadly descriptive of all those intended to be benefited. Yet, notwithstanding our

views, the circuit court of appeals, ninth circuit, in *The Hoquiam,* 253 Fed. 627, held that the 1915 act applied to merchant seamen only, and not to a longshoreman, the clause, "seamen having command shall not be held to be fellow servants with *those* under their authority," being construed to mean that "those" under authority means only seamen under such authority, and that a longshoreman is not included within the term "seamen." The language of the last act is "any seaman" etc., and while, as already suggested, we would so construe that term as to include all those who by their occupations are subject to maritime injuries, so as to give effect to what seems to us to be the manifest intent of Congress, yet, in the light of the case last-above referred to, we may hardly do so.

It therefore becomes necessary to inquire whether the hatch tender was a fellow servant of the respondent under the maritime law. The fellow servant doctrine has been thus defined:

"The fellow servant doctrine, it will be noted, is a departure from the ancient rule of respondeat superior, whereby an employer or principal is held liable for all such acts of his employee or agent as may be said to be the product of the service, or as it usually is expressed 'within the scope of the employment.' The doctrine seems to have been suggested by an English case decided in 1837 but it was first announced as a rule of law in a case decided by the South Carolina court in 1841, and that case was followed in Massachusetts in 1842. The rule was received with general consent ard for several decades was found not to be unadapted to the existing conditions. Like other rules of the common law it was based upon public policy or what is thought to be best for all classes of society. Public policy, it has been reasoned, requires that an employee should exercise proper care in the conduct of the business, and look to it that his colaborer does the same thing; and, when he is told that this care and prudence is his only remedy against danger from the negligence

of those employed with him, it not only makes him the more careful, but stimulates him to see that others exercise the same caution. 'Where servants of the same master are directly co-operating with each other in a particular business at the time of the injury, or are, by their usual duties, brought into habitual consociation, it may well be supposed that they have the power of influencing each other to the exercise of constant caution in the master's work (by their example, advice and encouragement and by reporting delinquencies to the master) in as great, and in most cases in a greater, degree than the master. If, then, each such servant knows that neither he nor his fellow servant, if injured by the other's negligence, can have redress against the master, he has such incentive to constant care, and such incentive to the exercise of his influence upon his fellow to incite him to constant care, that the well-being of society in such case does not demand that the master be made to answer. The same considerations of policy, which to avoid injuries to third persons usually demand that the master be held responsible, seem plainly not to demand it in the case of such coservants.' "  18 R. C. L., pages 715 and 716.

And its modifications are treated by the same authority as follows:

"Hardly had the doctrine of fellow service come into general recognition than it became apparent that rapidly changing economic conditions rendered it impolitic—at least in unmodified form. The doctrine was the product of the economic ideals that during the latter half of the nineteenth century sacrificed much to commercial interests, and to these same ideals we owe the development of the corporation and the enlargement of the sphere of activity of corporate bodies. The questions thereupon arose whether there should be a logical extension of the doctrine to these corporations. If they were to be exonerated from liability for injuries to their employees on the score of fellow service it followed that they could be liable in no case, inasmuch as they must need act and perform their functions through individuals who have a common employer. Changed ideals dictated a modification of the doctrine.

While some courts have protested that the rule in question is too firmly fixed in jurisprudence to be reversed or seriously modified by judicial decision, a great majority, being of opinion that it works an injustice in its application to the great enterprises of the present day, have been astute to engraft upon it so many modifications and qualifications that little is left of its original import. It has been said that the courts have been 'put to mighty labor and pother to administer old rules in the light of changed conditions and to put new wine of interpretation in the old bottles of the law—all with a semblance of preserving it from chaos or radical change.' The first of the qualifications of the doctrine to be generally recognized was the rule relating to the competency of coemployees. This seems to have satisfied requirements for a considerable time, but still further changes in economic conditions and public policy have dictated the principles of nondelegable duties, superior and inferior employees, and, more recently, different departments." 18 R. C. L., pages 716 and 717.

And, further:

"Another exception to the fellow servant doctrine as it was originally announced embraces what have been termed 'absolute' or 'nondelegable' duties of the employer. This exception, which seems to have been invented to meet the economic change caused by the substitution of corporations for natural persons in commercial enterprises, declares that there are certain duties which the employer is absolutely bound to perform. While the corporation may confide their performance to an inferior officer or agent, it may not escape liability thereby. If the person to whom performance is confided neglect the obligation his negligence is still that of the corporation. It is no answer to say that the corporation selected a competent person and that such person is in other respects a fellow servant of the injured employee. In respect of these duties he cannot be a fellow servant; he is a vice principal or agent of the employer." 18 R. C. L., pages 730 and 731.

The fellow servant rule appears to have been adopted by the admiralty courts from the common law, and we see no reason why the exceptions and modifications of that rule should not be held to have been adopted with the rule itself. True, we have been cited to no case where the admiralty courts have avowedly adopted the vice principal modification, but they seem to have applied it in *Alaska Pacific S. S. Co. v. Egan,* 202 Fed. 867; *Pacific American Fisheries v. Hoof,* 291 Fed. 306; *The Kinghorn,* 297 Fed. 621; and perhaps other cases; and it has often been recognized by the Federal courts in railroad cases, and no case has been brought to our attention in which the admiralty courts have refused to recognize it. It is not like a local statute or local rule destroying the uniformity of the maritime law, but, speaking generally, it is universally recognized and nation-wide in its applicability, and therefore its recognition has no tendency to disturb the rule as to uniformity.

We think, if the facts of this case are carefully considered, and it is recognized that respondent was working in a place and under conditions where he could do nothing for his own protection and must rely absolutely upon the performance by the master of the duty to warn him of descending loads, that the nondelegability of that duty becomes apparent and that the hatch tender, under the circumstances shown, became a vice-principal. In this connection, too, it may be said that, respondent having shown the conditions under which his work was performed and the duty of the master to give him warning, the failure to give that warning, and the consequent injury, the burden was then cast upon the appellant to show, if it could, that the fault lay with the winch driver, in that he dropped the load without orders so to do and before warning could be given. Not having attempted to meet that burden, the

instructions given by the trial court were right and the verdict cannot be disturbed.

We have considered the argument as to future pain and suffering and the claimed excessiveness of the verdict, but find nothing therein calling for further comment.

The judgment is affirmed.

PARKER, MAIN, BRIDGES, and ASKREN, JJ., concur.

## ON REHEARING.

[*En Banc.* July 27, 1925.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein. The judgment is therefore affirmed.