47 P.(2d) 865

STATE ex rel. ACKERMAN v. CITY OF CARLSBAD et al.

No. 4097.

Supreme Court of New Mexico.

June 25, 1935.

Rehearing Denied July 29, 1935.

Caswell S. Neal and C. M. Neal, both of Carlsbad, and Reed Holloman, of Santa Fé, for appellant.

James W. Stagner and Don G. McCormick, both of Carlsbad, for defendant appellees.

Hurd & Crile, of Roswell, and Rodey & Dickason, of Albuquerque, for intervener appellees.

C. R. Brice, of Roswell, and H. A. Kiker, of Santa Fé, amici curiæ.

W. A. Keleher and Theo. E. Jones, both of Albuquerque, amici curiæ.

Myles P. Tallmadge, of Denver, Colo., amicus curiæ.

WATSON, Justice.

This litigation concerns an issue of bonds by the city of Carlsbad in the sum of $500 each, and aggregating $366,000. They all bear date July 1, 1929. Except for the reserved option of the city "to redeem this bond at any time before maturity, by paying therefor its par value and accrued interest," they all mature July 1, 1940. An-

nual interest at 6 per cent. payable January 1st and July 1st of each year is provided for, and is represented by 22 coupons attached to each bond.

These are not general obligation bonds. Each recites that it was issued in exchange for "a like amount" of assignable certificates "representing the cost" of certain street improvements, and that it is payable solely out of "a special fund designated the Carlsbad 1929 paving fund" to be derived from collection of the assessments for benefits, which assessments are the basis of the assignable certificates for which the bond was exchanged.

While the city assumes no general liability for the payment of these bonds, it does obligate itself to create such paving fund, to collect and enforce the special assessments, to place the proceeds in the fund, and to pay "this bond out of such receipts *in the manner provided by the ordinance* under which this bond is issued."

Such a bond issue is an optional part of our statutory scheme for financing municipal improvements. An assessment for benefits having been made, each assessment is carried into a certificate of lien upon the benefited property. Usually these certificates are delivered to the contractor. He assigns them to the city. The city, in exchange, issues a like amount of its improvement bonds which the contractor

markets as he chooses or is able. Such was the procedure in this case.

The statutory authority underlying this issue leaves much to local discretion. It authorizes the city council to "fix the terms and conditions" of the bonds, subject only to the restrictions that the amount of the issue shall not exceed "the total assessments levied," that the maturity must be "on or before a date not later than twelve months after the last deferred installment of such assessments is due," and that the interest rate shall not exceed "the rate of interest on such deferred installments." Comp. St. 1929, § 90-1701.

Pursuant to other provisions of this and other statutes, the city created a paving district, levied an assessment for benefits aggregating $366,000, and issued lien certificates representing such assessments payable in ten equal annual installments, beginning July 1, 1930. These several installments bear interest at the rate of 6 per cent. per annum, payable semiannually, beginning January 1, 1930. The property owner might, however, pay the whole assessment within thirty days after the certificate of lien, in which case he would be rewarded with a 5 per cent. discount. He might also pay any or all installments before maturity, in such case being charged with interest to the next succeeding interest paying date.

The lien certificates also contained the provision that failure to pay any install-

ment of principal or interest when due should cause immediate maturity of the whole, and that the unpaid principal and accrued interest should thereafter bear interest at the rate of 1 per cent. per month. This provision, inserted in the certificates pursuant to the ordinance, we have held violative of the statute, which limits interest on assessments to 8 per cent. annually. City of Roswell v. Levers, 38 N. M. 419, 34 P.(2d) 865.

This done, the city proceeded, by Ordinance 207, to authorize the bond issue. It there specified the terms and conditions of the bonds and the manner of their payment, as the statute authorized, and set forth the exact form and tenor of the bonds which were issued. Among its important provisions, are these:

"That the Treasurer of the City of Carlsbad be and he is hereby authorized and empowered, and it shall be his duty to receive and collect all assessments levied to pay the costs of said improvements, the installments thereon and the interest thereon, at the times and in the manner heretofore specified, and to pay and disburse such payments to the person or persons lawfully entitled to receive the same, in accordance with the laws of the state of New Mexico, and all ordinances and resolutions of said City heretofore and hereby adopted. All moneys received shall be placed in a separate fund to be designated '1929 Paving Fund,' and shall be used for the purpose of paying the principal and interest on the paving bonds hereinafter mentioned, and for no other purpose whatsoever." Section 3.

"The said paving bonds shall be paid and discharged in numerical order, commencing with number one, and when the City Treasurer has funds on hand in said Paving Fund sufficient to pay the principal of any of said paving bonds, he shall notify the firm of ————— by written notice through the United States Mails, Postage Prepaid, designating the bonds to be paid, and thirty days after said notice is given, the interest on said paving bonds shall cease." Section 10.

Up to about the middle of 1934, this scheme had worked as follows:

There had been paid into the 1929 paving fund:

| | | |
|---|---:|---:|
| Representing the principal of assessments .................... | $92,320.70 | |
| Representing Interest on Deferred payments................ | 47,824.29 | |
| Representing Penalties for Delinquencies .................... | 2,656.40 | $142,801.39 |

There had been disbursed from it:

| | | |
|---|---:|---:|
| In payment of all interest coupons maturing prior to Jan. 1, 1934.......................... | $85,159.95 | |
| Retirement of Bonds numbered 1 to 76.......................... | 38,000.00 | $123,159.95 |

There remained in the fund:

Representing principal of assessments ...................... $14,457.69

Representing Interest on Deferred payments................ 5,183.75  $ 19,641.44

There remained unpaid the interest coupons due January 1, and July 1, 1934, in the principal sum of $19,680.

This clearly shows a heavy delinquency on the part of property owners. Moreover, the trial judge found that values had so fallen since the assessment was made that, unless there should be a recovery in the meantime, there would be "a deficit of approximately $100,000.00 in the collections which can be made from the property in the district."

Many of the counsel refer to this as an insolvency of the fund. It at least forecasts losses to the bondholders, who have nothing but the assessment liens to look to for satisfaction. If, as among the bondholders, there are any priorities of right, they are of great importance.

The plaintiff, owning bond numbered 77 and some others immediately succeeding in numerical order, seeks by mandamus to compel the city treasurer to apply $14,000 of the sum on hand in the paving fund, as above shown, to the payment and retirement of these bonds. He advances two contentions. First, that the whole scheme necessarily implies and requires that payments into the fund in satisfaction or reduction of the assessments themselves be employed in retirement of bonds, and that the interest coupons be paid from the interest collected on deferred payments. Second, that the bonds are to be paid in their numerical order.

It was determined below that matured interest coupons had the first call on the whole fund. As nothing would remain of the fund after such payment, the figures in fact showing a slight insufficiency, the alternative writ was quashed.

Strictly speaking, this disposition of the case below eliminates the second of appellant's contentions from this review, unless we shall find the court in error as to the first. Some of the counsel here engaged strongly urge, however, that both questions be decided.

Ordinarily we shall do well to content ourselves with a decision of the case before us. But this case is peculiar. The two questions are very nearly related, and no one has entirely succeeded in keeping them distinct in argument. Both require close inquiry as to the meaning and effect of the contract. There being numerous counsel, the issues and contentions are less clearly defined than in the ordinary two-sided case. We cannot but feel that a conclusion as to the second, perhaps the more far-reaching contention, is essential to safe decision of the first. Indeed, we cannot say that the trial judge was not in-

fluenced in deciding the first by an unannounced opinion as to the second. Certainly the positions of counsel are thus influenced. If we should find these bonds as to their principal equally and ratably secured, either according to the original contract or as the result of a supervening insolvency of the paving fund, the first question loses most, if not all, of its practical importance.

Adding to this, that if the second question shall remain undecided, it will surely be renewed unless the fund should never again contain more than enough to pay interest, and that other municipalities are troubled by doubts as to the application of similar funds, we have concluded to reverse the order of appellant's contentions.

Section 10 of Ordinance 207, above set forth, very plainly directs payment of these bonds in their numerical order. If this requirement is valid and controlling, there is nothing more to be said.

In considering this requirement, it must be kept in mind that it is a part of a contract on the faith and credit of which the public has been invited to invest. It must not be overlooked that the assessments are the bondholders' only resource. "Security" is a misnomer. There is no debt to be secured. The city's only obligation is to handle this fund according to the contract.

We find nothing in the arguments to engender doubt that it was within the original discretion of the city council either to give these bonds equal and ratable security, or to prefer some over others according to this or some other agreed and specified priority.

We find nothing to cause doubt that all parties are chargeable with notice of the statutes and ordinances governing. Barnett v. City of Denison, 145 U. S. 135, 12 S. Ct. 819, 36 L. Ed. 652, cited to the proposition that the references in the bonds are insufficient to give such notice, we deem not in point.

Little significance can attach to the omission to include in the bonds a provision that they were to be retired in numerical sequence. It is almost as significant that there is no provision for equal and ratable security. Strangely enough, not a single provision or recital shows that a particular bond is one of many bonds or of a series all based upon the certificates of lien. And while it cannot be said that the priority of one bond over another "stares" the investor "in the face," and while a proper consideration of the proneness of the public to invest blindly would suggest more explicit recitals, we cannot say that section 10 of the ordinance is not to be read into the contract.

We do not question that Ordinance 207, Ordinance 206, with respect to the assess-

ments and the lien certificates, and the statutes, should all be consulted. Many of their provisions are pointed to, all of which, it is urged, "provide or indicate payment by the equality method," leaving section 10 the sole support for the numerical order method. But in none of the provisions thus brought to our attention do we find anything substantially at variance with section 10. Section 7 of Ordinance 207 does specify "Bonds payable on or before eleven years from the date thereof." That is not inconsistent with section 8, which prescribes the form of the bond, embracing the city's option to redeem it at any time before maturity. We cannot view it as inconsistent with section 10.

◼ It is urged from one quarter that section 10 is to be rejected as invalid because the title of the ordinance gives no notice of a purpose to "provide for the payment of such bonds in numerical order commencing with No. 1." We are not sure that the title employed would not be sufficient even for a statute. Cf. State v. Miller, 33 N. M. 200, 263 P. 510. It is not our understanding, however, that N. M. Const. art. 4, § 16, is applicable to ordinances, nor do we know of any legal requirement that an ordinance be entitled. Cf. "Municipal Corporations," 43 C. J. § 802 et seq.

◼ So far the city treasurer has acted upon the view that he had at least the right to pay off the bonds in the order of priority prescribed by section 10. We do not understand his counsel here to admit any wrong in the retirement of 76 of them. Nor do counsel for owners of the higher numbered bonds suggest this as any breach of trust. The contention is that the requirement is not mandatory.

It seems to be the view of those counsel employed in the interest of owners of bonds bearing large serial numbers, as well as counsel for the defendants, that the direction of section 10 may properly be followed so long as the ultimate sufficiency of the fund is not questioned, but that when a loss to bondholders is threatened, that direction must be set aside so that the loss may be shared by all.

No one has pointed out where the power or discretion resides thus to vary the contract. It seems to be assumed that it is a matter for determination by the city. We think not. The governing body had exhausted its discretion in adopting the ordinance. It made it irrepealable and unchangeable, because it constitutes the contract with the investing public. The city treasurer is the trustee, if this be a trust. His is the discretion if there is any.

One brief suggests the invalidity of section 10, as an attempted delegation of the city's legislative or discretionary power to the treasurer. It strikes us rather that the matter was not thought to be dis-

cretionary, and that it was appropriately intrusted to a ministerial officer.

The one thing that would have assured a deficiency in this financial operation was to permit accumulations in the paving fund. The money must move out as rapidly as possible. The liens must earn the interest for the bonds. Money in the paving fund cannot do that. To illustrate the importance of this fact: The bonds, during their eleven years, call for $241,560 of interest; the liens, paid off one-tenth each year according to schedule, will yield interest to the amount of $120,780 only.

So, some manner of paying off the principal from time to time before maturity is an essential of the plan. Proration as to principal, though no doubt legal, would have been impracticable. Such bonds would probably have been no more marketable than the lien certificates themselves. It would have been too suggestive of insecurity. It was not contemplated by those who formulated this contract.

The only other way was some order of priority. Such was prescribed in section 10. But counsel say that it was not intended thus to prefer one bond over another in right or in security; that it is merely the convenient means to meet the necessity just mentioned, adopted when it was not assumed that any bond need go unpaid; and that when we are faced with an insolvency of the fund, we must discard this adopted and highly necessary scheme of retirement for another which, though it equalizes the loss, will surely greatly magnify it.

It is not easy to reconcile a priority of payment, which this contract plainly prescribes, with the equality of security urged. Where the fund is barely adequate, so that any considerable failure to collect assessments must result in deficit, it would seem that parties agreeing to priority of payment must contemplate priority of security.

To insure that all bondholders eventually participate alike in this limited fund, the principle should have operated from the beginning; not after ultimate inadequacy had developed and after 76 of the bonds had obtained priority of both payment and security.

Yet no one contends that such was the intent. The Legislature prescribed an issue of "negotiable coupon bonds," payable "on or before" a designated time. That did not contemplate payment in equal annual installments, each to reduce the principal of the bond and necessarily the semiannual interest earning. If the plan had worked perfectly, and had meant equal and ratable security, each $500 bond, payable on or before July 1, 1940, would have become, on July 1, 1930, a $450 bond; each remaining $15 coupon would have become a $13.50 coupon. All character as "negotiable coupon bonds" would have been lost.

But, despite the fact that neither Legislature, city counsel, nor any party took care to insert in the contract any stipulation for equal and ratable security, it is claimed that it is so strongly to be implied as to override a plain provision for priority of payment, when it appears that to pay some in full will prevent others from being paid eventually.

If there were merit in this contention, it would be unfortunate that it was not made on July 1, 1930. Then, almost as plainly as now, it appeared that priority of payment would be fatal to equality of security. Then, there had come into the fund $26,572.64, instead of the scheduled $58,560. Then assuming, as the trial judge held, that interest had the first call, there was for application on principal $4,612.64, instead of the scheduled $36,600. Then, unless that sum were to remain idle and cause loss, there should have been sent out 732 checks, aggregating 1.26 per cent. of the principal, $6.30 on each bond, reducing the remaining coupons to $14.81 each. Then this scheme devised, so we are told, to escape the investor's dislike of a security small or odd in amount, and to offer something at least resembling a $500 negotiable coupon bond, would, within a year, and under conditions easily to have been anticipated, have produced a situation incomparably more difficult and confused than if the assessment liens had been marketed as they were.

But we perceive no merit in the contention. We find nothing in this contract to stop the operation of the stipulation for payment in numerical order in favor of an equality of security which is nowhere agreed to, and can only be implied from an instinctive preference for it. If the present situation be regarded as a wrong to investors, it is the loss itself that constitutes the wrong, not its incidence. If the scheme be deemed inherently dishonest, it is not because it puts the loss upon the investors in the higher numbered bonds, instead of spreading it over all. We cannot see that it is or would have been any more moral or honest to cause a loss of $100 to each of 732 persons than to cause a loss of $500 to each of a less number.

Indulging the view that the plan could ever have been or have been thought to be practically sound, it was not merely the owner of the bond next in line for retirement who was interested in having it immediately paid. All other owners, and particularly the owner of bond 732, were interested and might demand prompt action. Every delay would jeopardize another bond of the higher numerical order.

Considering that a plan originally thought sound has now broken down, so that some bonds cannot be paid in full, there will be many owners intermediate those who are sure to lose and those who are sure not to lose. Who shall say where

the interest of the owner of bond No. 600 lies? He has the same right as plaintiff has to demand the payment of bond 77 in its proper order. Likewise, he has the right to refuse any partial payment. The reserved right to redeem before maturity is conditioned upon payment of "par value * * * and accrued interest."

For the losses with which innocent but imprudent investors are here threatened we have great regret. So far as we can know, however, they are voluntary parties to a contract which it is our business to enforce. The contract is highly speculative to the eyes of any one looking into it at all. We have no right to assume, though we may well fear, that all parties did not consider the chance of loss in making the investment. Nor may we assume, as it has been assumed in argument, that these bondholders are equal contributors to the cost of paving. We must assume, we think, that these bonds were marketed for what they were considered worth, in view of the character of the security and the details of the plan.

"Equality is equity" is a controlling maxim in its place. It is invoked when rights are equal. It does not call for proration as between first and second mortgages. We cannot see how it can authorize the custodian or trustee of this fund to set aside the plain priority of this contract. It is not to be varied because of subsequent developments which might well have been anticipated by all concerned, but to which optimism was then closing most eyes.

We have no occasion here to question the general rule of State ex rel. v. Duncan, 334 Mo. 733, 68 S.W.(2d) 679, 684, "that when a trust fund raised by special assessment is insufficient to pay all having equal claims upon it, payment should be made ratably." And we think that no case cited in support of the "equality method" goes farther. The basis of that rule is equality of right or of claim. Here we have inequality.

Perhaps we should mention Meyers v. City of Idaho Falls, 52 Idaho, 81, 11 P. (2d) 626, 628, on which much reliance is placed. For there the governing statute contained a provision very similar to section 10 of Ordinance 207, and it was held directory. However, another statutory provision, deemed in pari materia, prescribed that the bonds "shall be equal liens * * * without priority of one over another. * * *" Both provisions could not have been intended in their full significance, and so the court was able to give effect to the priority provision only until it came into conflict with the equality provision.

It is interesting to note from this Idaho decision that the Legislature had already cured the inconsistency. In 1927 it codified the subject of municipal improvements,

omitting the equality provision and retaining priority provisions. The court opined it "improbable that a question similar to the one we are considering can ever arise under the new law."

In a later decision, holding the priority provision of the Idaho drainage law "mandatory, a provision which the bondholders have an absolute right to rely upon," the Supreme Court of that state explained the earlier decision in Meyers v. City of Idaho Falls, supra, as we have explained it, as controlled by the presence of the equality clause side by side with the priority clause. Straus v. Ketchen (Idaho) 28 P.(2d) 824, 832.

State v. Little River Drainage Dist., 334 Mo. 753, 68 S.W.(2d) 671, is quite similar in principle to Meyers v. City of Idaho Falls, supra. As in the Idaho case, there were offsetting express provisions for equality and for priority, in the Missouri case there was no express provision for either equality or priority, but there were implications, as the court thought, that both were contemplated. The equality implications were held to check the priority implications at the point of insolvency.

Our conclusion that section 10 of Ordinance 207 is a controlling and mandatory provision of a contract, which we have no right to vary, finds support in State ex rel. Boyd v. Mills, 133 Wash. 681, 234 P. 1042, 238 P. 581; Johnson v. McGraw, 139 Wash. 139, 245 P. 915; State ex rel. Moses v. Walters, 156 Wash. 664, 287 P. 874; O'Donnell v. Cullen (10th C. C. A., April 10, 1935) 76 F.(2d) 955.

In the light of this holding, we have now to determine the priority as between the principal of the bond next in line for payment and the matured interest coupons on all bonds.

Section 10 provides that the bond next in numerical order is to be paid "when the city treasurer has funds on hand in said paving fund sufficient to pay the principal of any of said paving bonds." Literally that condition is fulfilled if the fund contains $500 plus the amount of the accrued interest on that sum.

But appellant does not claim that such is the meaning. Considering the whole contract, it is plain to our minds that it is not. We need not marshal the reasons for so concluding.

When appellant abandons the literal meaning and seeks some lesser benefit, he necessarily admits that this particular condition of the contract is ambiguous and requires construction.

Appellant's contention is that within the "1929 paving fund" there must be set up two accounts, in which shall be entered respectively the principal and the interest collected upon liens, and that whenever the principal account rises to $500, the event has occurred which calls for payment of a bond, and that the employment of that

account in payment of interest is a misapplication.

There is nothing in bond, statute, or ordinance calling for such a matching of principal with principal and interest with interest. But appellant says that we must presume an original intent to satisfy the bonds, both principal and interest, and that only by such a matching is that result possible.

The theory is this: $366,000 of bonds having no resource for their satisfaction except an equal sum in liens, if a $1,000 lien be paid off and the amount used to pay interest, there is an immediate loss of $1,000 in the underlying resource. This impressed us at first as indisputably true. The trial judge was so impressed. He said: "The City of Carlsbad has paid out for interest a little more than $54,000.00, received from the property owners for principal payments on the paving assessments, so that there is certain to be a deficit of $54,000.00 even if all assessments were paid in full."

It is not true, however, that the resources side of the fund has suffered a certain shrinkage of $54,000. Interest to that amount evidently was not collected when due. But it is still owed, and still belongs in the account. These defaults bode ill. But it is not temporary unbalancing of principal and principal or interest and interest that will bankrupt the fund. But two things can cause a large deficit. One we have already pointed out—allowing money to lie idle in the fund. The other is forecast by the finding—eventual failure to realize on some of the liens.

So there was no compelling necessity going to the ultimate successful working of the plan, to require the matching appellant demands, as there was such necessity for paying principal when moneys available would otherwise lie idle.

It is true, of course, that the paid liens have proven better security than those which have been so long in default. In that sense the "security" has been depleted. That is all covered in the trial judge's forecast of an eventual $100,000 shortage.

New First National Bank v. City of Weiser, 30 Idaho, 15, 166 P. 213, 215, is cited as controlling in principle. Considering what was actually decided, and the quite different scheme of financing there involved, we find it neither controlling nor persuasive. The Idaho Supreme Court considered it not to have been the intent that money paid by one property owner in satisfaction of his assessment could be diverted "to the payment of interest or principal due from * * * owners who failed or neglected to pay their assessments as required by law." Under our plan, no property owner, whether he has paid in full, has paid nothing, or is paying according to schedule, can have any interest in the application of the fund.

The intent of this contract seems to us the controlling matter. We cannot read into it for the protection of appellant something that is not there, for the same reason that we cannot read out of it what is plainly there in his favor. Those who formulated the plan gave such preference to the lower numbered bonds as was thought proper. This preference was not given as a favor. It, or some other means of retiring the bonds, was essential to the plan itself. On the other hand, nothing inherent in the plan requires a subordination of the accrued interest to the retirement of a bond, and all implications of the contract itself are against it.

Thus rejecting appellant's two-fund theory, and rejecting the literal interpretation, there remains the question, of interest to the bondholder and to the city treasurer, When must the latter be deemed to have "funds on hand in said paving fund sufficient to pay the principal of any of said paving bonds," so that there will arise on his part a clear legal duty, enforceable in mandamus, to retire one or more bonds?

It is sufficient for the disposition of this case to hold, as we do, that so long as the amount on hand is insufficient to pay matured interest coupons, the treasurer's duty to retire a bond or bonds is not so clear as to be enforceable.

Generally speaking, it may be said safely that the treasurer's duty is to retire the bonds as fast as he can with a due regard for the necessity of meeting interest payments as they mature. So long as he is proceeding thus, he must be deemed to be administering his trust reasonably and properly.

The judgment not being inconsistent with these views, it will be affirmed, and the cause will be remanded.

BICKLEY and ZINN, JJ., concur.

HUDSPETH, Justice (specially concurring).

I concur in the affirmance of the judgment of the district court, but I am not in accord with the prevailing opinion, in the interpretation placed upon the ordinance, to the effect that the bonds must be paid in their numerical order. It seems to me that such an interpretation of the ordinance must necessarily be followed by a holding of invalidity, for the reason that a small per cent. of the bonds, even if every assessment is paid on the due date, would have nothing in the way of security behind them. If such be the holding, the city of Carlsbad was without authority to issue the bonds. In the case of City of Roswell v. Levers, 38 N. M. 419, 34 P.(2d) 865, 868, we said:

"It is then asserted that there is a necessary loss in collection, so that there will be a deficit in the account from which the bond interest is to be paid. It is argued:

'If a property owner pays an installment of his assessment at any time, the interest on the amount so paid ceases from the date of payment. It takes from one to four months for a municipality to accumulate sufficient principal payments to retire a single bond, the smallest denomination of which is $500. During the period in which the principal sum is being accumulated to retire a bond the interest on the outstanding bond keeps running, whereas, the interest on the respective payments ceases from the respective dates of payment. Consequently there is a lag between the interest collected from the property owners and the interest payable out on the bonds to the bondholders. If interest at 1% a month cannot be charged the owners who are delinquent in their payments, no paving fund in the state of New Mexico will be sufficient to pay out the principal and interest of the paving bonds in full. This deficiency is inherent in the statutory method of financing. It is self-evident and it is an incontrovertible fact.' The argument is not persuasive.

"In the first place, while the aggregate of the bonds must not exceed the aggregate of the assessments, nor the bond interest rate exceed the rate limited for the deferred payments of assessments, it does not follow that the bonds may not be less, either in principal or interest. If it could be argued that the aggregate of the bond issue and the aggregate of the assessments must be the same, a matter unnecessary now to decide, it clearly cannot be maintained that the interest rate of the bonds may not be less than that of the deferred payments of the assessments. We must assume that, in making the city the collecting agent, and in leaving the maximum interest rate 8 per cent. on deferred payments, the Legislature considered that it left room to finance the project. * * * The ordinance here in question stands upon special statutory authority, and the statute itself specifies the means of enforcement. It fixes a lien on the property which may be foreclosed as a mortgage. It authorizes interest on deferred payments which may be less but not more than 8 per cent."

To say that the Legislature authorized the issuance of bonds with nothing in the way of security behind them—no possibility of one cent being paid on the principal of the bonds—is not justified. Common honesty and public policy forbid such practices. This situation must not be confused with the case where the security is inadequate or becomes valueless. Here there was none in the beginning.

I do not feel, however, that the bonds are invalid. The construction contended for by the appellees seems the more reasonable. They state: "The language of the bond particularly lends stress to the position of the City that Section 10 of

Ordinance No. 207 is directory only and provides merely an orderly method for retiring the bonds and that the bonds are required to be retired when collections will warrant calling bonds after the due obligations of the fund have been paid. The bonds on their face state that they are not due, except at the option of the City, until 1940. The option is given the City to retire the bonds at any time prior thereto. * * *"

Under well-recognized rules of construction, if a statute or an ordinance is reasonably susceptible of two constructions, one of which would render it valid and the other invalid, the construction which would render it valid should be followed. The syllabus by the court in State v. Southern Pac. Co., 34 N. M. 306, 281 P. 29, is as follows: "Where the language of a statute is doubtful, or an adherence to the strict letter would lead to injustice, absurdity, or contradiction, the statute will be construed according to its spirit or reason, even though this necessitates the rejection of words and substitution of others." See, also, Continental Oil Co. v. City of Santa Fé, 36 N. M. 343, 15 P.(2d) 667; 43 C. J. 569, 570; 59 C. J. 969. The statute authorized the city to issue bonds only with the liens as security. The construction placed upon the ordinance by the majority, in my judgment, contravenes the sound rule that "the council did not intend doing what it had no power to do."

Under the findings of the court, which are not challenged, we have an estate hopelessly insolvent, with the trustee praying for directions as to its distribution. Whether or not it was originally planned to divide these funds into an "interest fund" and "principal fund" is now immaterial. The funds should be distributed, as they are collected, ratably among all the bondholders, a like sum on each bond.

SADLER, Chief Justice (specially concurring).

With the majority view that the bonds here involved are payable in numerical order, notwithstanding an assumed insolvency of the fund securing them, I do not agree. The conclusion that they are so payable rests upon the premise that "it was within the original discretion of the city council either to give these bonds equal and ratable security, or to prefer some over others according to this or some other agreed and specified priority."

I consider the premise an assumption beyond the implications fairly arising from a construction of the statute as a whole. Equal and ratable security is strongly suggested, even if not expressly enjoined, in the very plan exposed by Laws 1923, c. 133 (1929 Comp. § 90-1701). Under this statute, bonds may be issued "in an amount not exceeding the total assessments levied." While it is true the governing body of a town or city is given authority to "fix

the terms and conditions of such bonds," its sphere of action, of course, is circumscribed by implied as well as express restraints in the act. One restraint added by way of a proviso as part of the very sentence conferring authority to fix terms and conditions, reads: "Providing, however, such bonds shall be made payable out of the moneys collected from said assessments."

A special fund is thus created for retirement of the bonds. "Such bonds," meaning each and every one of them, the first as well as the last in numerical order, "shall be made payable out of the moneys collected from said assessments," etc. That the statute fairly reflects this meaning is disclosed by the plan of financing which it authorizes. Assignable certificates of lien in irregular amounts are to be "pooled" or "funded" to support any bond issue authorized. The bonds, in amount, may equal, but cannot exceed, the total assessments levied. If we stop here, can there be any doubt of legislative intent that the bonds so issued shall succeed to the lien of the certificates securing them in equal and ratable proportion? The question, in my opinion, furnishes its own answer. "The bonds succeed to the lien of the original assessment, and the assessments thereafter levied and collected is (are) a 'trust fund pledged by law for the payment of the bonds.' Jewell v. City of Superior (C. C. A.) 135 F. 19." Meyers v. City of Idaho Falls, 52 Idaho, 81, 11 P.(2d) 626, 628.

But the statute furnishes further proof that equal and ratable security was the legislative intent. It provides: "In case the governing body of such municipality shall fail or refuse to cause any lot or parcel of land to be sold for any delinquent assessment or installment thereof or interest thereon, then the holder or holders of any bond or bonds secured by such assessment may foreclose the assessment lien on such delinquent property in the method now provided by statute for the foreclosure of mortgages (on) real estate." 1929 Comp. § 90-1701.

The financial condition of the district, as disclosed by the record before us, ordinarily should furnish a complete defense to an attempt at foreclosure by the holder of the last-numbered bond. Any stranger, if interest be the test of an enforceable right, could as well qualify as a plaintiff in foreclosure. And yet, the statute carries the right of foreclosure, even in a case such as the instant one, to the holder of the very last-numbered bond. In so doing, the Legislature must have considered the holder of every bond, the first as well as the last in numerical order, possessed of such an interest in each and every lien, whether before or after insolvency, that it might profit him to foreclose. Thus the statute again reflects an idea of equal and ratable security.

The opinion of the Supreme Court of Alabama in Howard v. State, 226 Ala. 215, 146 So. 414, 419, to my mind, gives a perfect concept of the relationship which the Legislature intended should subsist between the bonds authorized by it and the liens set up as their security. It said: "When the improvements, in respect of which these bonds were issued, were completed, and the assessments made final against all of the benefited property, each holder of one of the 124 bonds issued to pay the cost of such improvements had vested in him a 1/124th interest in the liens given by the statute *upon each of the many pieces of property,* against which the assessments were levied. * * * Each holder of one bond has a 1/124th vested interest in each, and all of the assessments, and that security cannot be impaired by any statute subsequently enacted impairing that lien." See, also, In re Cranberry Creek Drainage District, 202 Wis. 64, 231 N. W. 588, 85 A. L. R. 242.

In State v. Mills, 133 Wash. 681, 234 P. 1042, 238 P. 581; Johnson v. McGraw, 139 Wash. 139, 245 P. 915; and State v. Walters, 156 Wash. 664, 665, 287 P. 874, the Supreme Court of Washington had before it cases under a statute which itself directed payment of the bonds in numerical order. The same is true of Straus v. Ketchen (Idaho) 28 P.(2d) 824, and O'Donnell v. Cullen (10th C. C. A., April 10, 1935) 76 F.(2d) 955. I do not for a moment question the power of the Legislature either itself to direct payment in numerical order, or to empower the governing body of a municipality so to do. What I do question is our right by construction to read such authorization into the language empowering the governing body to fix terms and conditions of the bonds in the face of strong implications of the statute that equal and ratable security was intended.

In Meyers v. City of Idaho Falls, supra, the Supreme Court of Idaho construed two statutes which governed the bond issue involved. One carried the equality clause, the other the provision for payment in numerical order. All of the bonds were issued and matured on the same date. The court was of opinion that under such circumstances the equality clause would be implied in the absence of an express prohibition in the act. It said:

"Under the acts which we are considering, the bonds are all issued on the same date and they mature on the same date. *The equality clause would under such circumstances apply in the absence of an express prohibition,* and, being expressly enacted in the same act, it would be a broad assumption to say that by mere numbering this claim is rendered entirely nugatory." (Italics mine).

So here, the same conditions prevailing, the statute certainly not expressly pro-

hibiting equality, but on the contrary rather strongly suggesting it, I must find clearer manifestation of legislative intent that a governing body has power to deny it than the mere bestowal of a general power to fix terms and conditions of the bonds. The power in a subordinate governing body to displace an equality of security otherwise obviously arising as plain implications of the statute under which it derives its authority to act at all, is a broad one. It should not rest on doubtful inference, and, on the contrary, should have the support of implications so strong as to render any other deduction almost inescapable.

Of course, we all agree that the governing body is restrained in its power to fix terms and conditions, not alone by express limitations in the act, but as well by those plainly to be implied. And any purchaser is charged with knowledge of such limitations on its power.

Then what is the effect of the ordinance provision for payment in numerical order? Possibly the city council intended it to be mandatory and to affect the equality of security otherwise obtaining. But so to construe it renders it void as going beyond the statute under the view entertained by me. On the other hand, if considered no more than provision for an orderly method for retirement of the bonds, effective and operative until recognized insolvency appears, it takes on a directory character, and is not ultra vires the powers conferred by the act under which the governing body moved.

Whatever the actual intent present in the minds of members of the governing body in writing section 10 of the ordinance in question, I believe it should be given effect only within the limits of express or implied statutory restrictions. So construed, I consider it directory only. We then have a situation almost identical with that disclosed in Meyers v. City of Idaho Falls, supra, and calling for a like conclusion.

State v. Little River Drainage District, 334 Mo. 753, 68 S.W.(2d) 671, 674, involved drainage district bonds. There was no inexhaustible fund, since the tax could not exceed the benefit assessments, and the act was held clearly to contemplate that as bonds and interest coupons matured they should be paid in full out of moneys collected. Among other things, the court said:

"* * * The bonds are payable solely out of special taxes levied against benefit assessments initially charged on the various tracts of land in the district, and as to each tract the tax cannot exceed the benefit assessment standing thereagainst. If the tax returns within these limits are and will be insufficient to pay all bonds and interest in full, the district is in legal effect insolvent.

"Second, though the limitations imposed by the article on the taxing power of the district are such as may reduce it to a state of insolvency, nevertheless the statute makes no provision for preference or priority between bonds or bondholders, but, on the contrary, pledges the taxes collected to the payment of *all* the bonds sold, with interest."

So in the case at bar does the *statute* pledge the taxes to the payment of *all* the bonds. Nor does our statute, any more than does the Missouri statute, make "provision for preference or priority between bonds or bondholders." The decisive question is: Does it authorize the governing body to do so? In my opinion, it does not. In the case just quoted from, the court further said:

"Considering together the three groups of provisions reviewed in the preceding paragraphs, we are clearly of the opinion that performance of the requirements of section 10788 [Mo. St. Ann. § 10788, p. 3515] with reference to the payment in full of bonds and coupons as they mature is contingent on whether the drainage district is solvent—or, in other words, on whether there are and will be, so far as appears, sufficient tax revenues to pay all bonds and coupons in full. The section *assumes* the solvency of the district and on that basis provides for disbursements from time to time out of the bond fund to pay matured bonds and interest; and the fund is replenished by successive subsequent tax installments paid in. To that extent matured and next maturing bonds and interest have a prior claim on the fund at any given time. But that does not mean the fund is not held in trust for the benefit of all the bonds. The matured bonds are entitled to be paid in full *because* those of later maturity in their turn will be. * * *

"The very reasons which require the payment in full of bonds and coupons of the drainage district as they come due, so long as the district is solvent, would require that they be paid only ratably if the district becomes insolvent. By no other means can all the provisions of the article be harmonized and the parity of claim of all the bonds enforced."

Again, in State v. Duncan, 334 Mo. 733, 68 S.W.(2d) 679, 683, the same court, dealing with the Missouri drainage acts, said:

"* * * All matured bonds should share *ratably* in the fund as it stands and likewise in replenishments thereof. In that way all will be paid in full without discrimination or chance of miscarriage, receiving interest to the date of payment if the bonds so provide.

"The statute gives them no rights beyond that. It contemplates, of course, that all bonds, and therefore each particular bond, shall be paid in full, but above that it requires equality."

Although entertaining a different view from the majority upon the effect to be given the provision for payment of the bonds in numerical order, as a part of the contract, this divergence of opinion does not affect my conclusion that the judgment of the trial court is correct. I therefore concur in its affirmance.