[No. 31528. · Department Two.   April 26, 1951.]

RAY H. LARSON *et al., Respondents,* v. CLYDE E. BEAR *et al., Appellants.*[1]

'Reported in 230 P. (2d) 610.

*A. O. Colburn* and *Joseph A. Simpson,* for appellants.

*Cashatt & Turner,* for respondents.

GRADY, J.—The respondents were owners of residence property in Spokane. Appellant Clyde E. Bear was engaged in the real-estate business. Eugene H. O'Brien was in his employ as a salesman. On September 10, 1948, respondents gave to appellants an exclusive listing of their property, with authority to secure a purchaser. The listing extended to September 13th. On September 28th, another listing was given extending to October 28th. On November 1st, the listing was extended to January 1, 1949. All of the transactions were conducted between respondents and the salesman. Between September 13th and 28th, respondents made efforts to sell the property. They went to California to reside the early part of October, 1948. Their daughter and her husband resided in the home during October.

The respondents returned to Spokane about November 1st, and a few days later again went to California. The daughter and son-in-law accompanied them. The furniture was left in the house awaiting the finding of a suitable dwelling at the newly established place of abode in California. In the early part of December, respondents caused the furniture and Bendix washer to be shipped to them. About December 20th, the plumbing became frozen. Pipes in the basement and in the bathroom burst. The water which escaped caused considerable damage.

The respondents brought this action to recover damages to their property. The case was tried before the court without a jury. The court entered a judgment against appellants and Eugene H. O'Brien, the salesman. Bear and wife have taken an appeal. We shall refer to them in the singular as appellant, and to O'Brien as defendant. The Larsons are referred to in the singular as respondent.

The claim of respondent was that when the last listing was made he informed defendant he was leaving for California and did not intend to return. He also informed him that the house would be vacant. Defendant requested that the utilities and furnace be left on so the house would be warm when open houses were conducted, and agreed to see that the oil tank was kept filled. Keys to the house were given to defendant. At that time, the oil tank of 250 gallons capacity contained 100 gallons. Respondent further claimed that it was agreed defendant would secure the fuel oil from the Great Western Fuel Company, with whom respondent had an account, and have it charged to him.

The version of the agreement given by Mrs. Larson was that inasmuch as the furniture was being left in the house, defendant stated he would like to have all of the utilities left on, such as light, heat and water; that it would then be easier for him to make a sale; that he expected to hold an open house but could not do so if it was too cold; that he would take care of everything; that he would be in the neighborhood at least two or three times a week and it would be no special effort on his part to check the house for fuel; that he was told where he could order the fuel if the tank ran out. The version of the defendant was that he told respondent the sale of the house would be facilitated if the furniture remained and the utilities were left on; that due to extreme weather it would help a lot to have the house warm; that he planned on having open houses, but could not do so in sub-zero weather; that he did not know how much oil was in the tank, but there was to be a sufficient amount left by respondent; that he understood when respondent left the tank would be full; that respondent did not request him to have any oil put in the tank; that although the question of his taking care of the property, looking after the oil and ordering it, checking the thermostat, etc., was brought up, he did not tell respondent he would look after the property, and when asked to order fuel he definitely refused.

The trial court accepted the view of respondent and made findings of fact in accordance therewith, among which was one "that the oil became exhausted and the furnace cut off." We have been unable to find any direct evidence of such fact. Respondent testified that he was notified by one of the neighbors that his house was flooded. He was then in California. He was asked if he knew what caused the flooding, and he stated: "The oil tank went dry." It was apparent he had no testimonial knowledge of such fact, and an objection was made that if his knowledge was gained by statement or letter it would be hearsay. The court suggested that it did not clearly appear whether or not the witness was testifying from his own knowledge. The subject was not pursued further.

The finding is necessarily based upon the inference that the pipes froze because the furnace stopped operating, and it stopped because the oil tank went dry. It does not appear that respondent or any of the persons who inspected the damage done by the bursting of the water pipe looked into the tank and found it was empty.

The furniture was taken out of the house and shipped to respondent in the early part of December. A neighbor testified that she learned from the party who moved the furniture that the furnace was not operating. She further stated that she believed the furnace had not been operating for some time previous to the moving, because the windows were frosted. A key had been left with her, but she did not enter the house until the party came to move the furniture. It does not appear just how long the furnace continued to operate after respondent's daughter vacated the premises the early part of November.

Any one who has ever operated an automatic oil furnace knows that it will occasionally stop running for reasons other than the shortage of fuel oil. The record being uncertain as to the time elapsing between vacating the premises and when the furnace stopped operating, it cannot be said with any reasonable degree of certainty that all of the oil in the tank was consumed and thus the furnace stopped run-

ning. The burden of proof was upon respondent to establish his claim that the furnace stopped running because the oil supply became exhausted, and this, in our opinion, he has failed to do. This conclusion is sufficient to dispose of the case, but there is also another phase which we consider necessitates a reversal of the judgment.

The appellant contends that, if the defendant made a verbal agreement with respondent to assume the responsibility of keeping the furnace supplied with fuel oil, he acted beyond the scope of his authority as a real-estate salesman. We are persuaded that the unusual situation presented by the record demands such a conclusion. There is no claim made that defendant had any express authority to enter into the verbal agreement with respondent. If appellant is bound by the agreement, it must be by the application of the doctrine of implied or apparent authority. Most of the authorities dealing with this subject had under consideration an owner of real estate, or other principal, who employed a broker, a real-estate salesman, or other agent to find a purchaser of his property, or to do some other act for him, and the question of authority to bind the principal arose in connection with transactions with such purchaser or other party. In this case, it is the authority of a salesman employed by a broker that is involved. The parties to this appeal recognize that the same principles of law are applicable to both situations, and we shall do likewise.

As a general rule, a real-estate salesman is a special agent with authority limited to finding a purchaser of the property his principal has listed for sale, and persons dealing with him are bound, if they would hold the principal, to ascertain both the fact of agency and the nature and extent of his authority. *Carstens v. McReavy,* 1 Wash. 359, 25 Pac. 471; *Samson v. Beale,* 27 Wash. 557, 68 Pac. 180; *Johnson v. Williams,* 133 Wash. 613, 234 Pac. 449, 238 Pac. 581; *Kosten v. Fleming,* 15 Wn. (2d) 523, 131 P. (2d) 170; *Northwest Poultry, etc. Co. v. A. C. Fry Co.,* 27 Wn. (2d) 35, 176 P. (2d) 324; *Lee v. Estabrook,* 28 Wn. (2d) 102, 181

P. (2d) 830; *Stenson v. Thrush*, 36 Wn. (2d) 726, 219 P. (2d) 977.

In our opinions, we have cited other cases relating to the subject of implied authority of real-estate brokers and salesmen. A review of them indicates that such agents do not have implied authority to make a contract of sale, or make representations as to the quality, condition, or income of property, but are limited to finding a purchaser, showing the property to him and identifying it or indicating its boundaries.

An agent may have what is termed "apparent" authority. It exists when, though not actually granted, the principal knowingly permits the agent to perform certain acts, or where he holds him out as possessing certain authority; or, as sometimes expressed, when the principal has placed the agent in such position that persons of ordinary prudence are led to believe and assume that the agent is possessed of certain authority, and to deal with him on reliance of such assumption. *Galbraith v. Weber*, 58 Wash. 132, 107 Pac. 1050; *Cannon v. Long*, 135 Wash. 52, 236 Pac. 788; *Mohr v. Sun Life Assurance Co.*, 198 Wash. 602, 89 P. (2d) 504; 2 Am. Jur. 68, Agency, § 85.

Another rule applicable to cases of this kind is that a power given an agent to perform a particular service carries with it the authority to do whatever is usual and necessary to carry into effect the principal power. *Johns v. Jaycox*, 67 Wash. 403, 121 Pac. 854; *Yarnall v. Knickerbocker Co.*, 120 Wash. 205, 206 Pac. 936.

The respondent has not brought himself within the foregoing rules. As a person of ordinary prudence, reasonably conversant with business usages and customs, he should have realized and understood that the authority of defendant was limited to finding a purchaser for his property according to the terms of the listing agreement, and that it was not usual or customary for real-estate brokers to take charge of listed property, secure fuel oil and keep an oil burner operating while a purchaser was being found. Appellant did not hold out to respondent or to anyone else

that his salesman had any such authority, and did nothing to lead respondent to believe and assume that the defendant was so possessed.

The fact that it was customary in the sale of houses to set aside certain times when the realtor or his agent would hold what was termed by the trade as an "open house" during a day or evening to receive prospective purchasers was not sufficient to justify a belief on the part of respondent that such would be done during severe winter weather. Open houses had been held by defendant while the house was occupied. The fact that the defendant indicated to respondent that, inasmuch as the furniture was to remain in the house for a time, he would be aided in making a sale if the heating plant remained in operation and the lights and water were not turned off, was something so unusual and not of such necessity to effect the sale that it can be said that the authority to find a purchaser carried with it the authority to assume responsibility for keeping the heating plant in operation and securing the fuel therefor.

Inquiry was made as to the existence of any custom among realtors to take charge of properties listed with them for sale, but those who testified conveyed the impression that this was not done except in cases of occupied apartment houses. Some realtors operated and managed them when there existed an exclusive listing for sale. No one asserted there was any custom to take charge of vacant dwelling houses and keep up the fuel supply in order that oil furnaces would remain in operation. We gather from the evidence, the open house idea contemplated the exercise of such privilege while the house was occupied, and not to such an extent as to authorize a salesman in order to have open houses to contract as respondent claims was done by defendant.

Other questions have been raised which we have given consideration, but have found them to be either without merit or unnecessary to be decided in view of the disposition we are making of this case.

The judgment against Clyde E. Bear and Pearl M. Bear is reversed and the cause remanded for the entry of an

order dismissing the action as to them. No appeal having been taken by Eugene H. O'Brien, the judgment against him is not affected.

SCHWELLENBACH, C. J., ROBINSON, MALLERY, and HAMLEY, JJ., concur.