# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| AMERICAN PRIDE LENDING, LLC, AMERICAN PRIDE HOSPITALITY GROUP, INC., MARY WYNN, and THE WYNNERS CIRCLE, INC.,[†] | No. 58116-7-II |
| Respondents, | |
| v. | UNPUBLISHED OPINION |
| JOHN B. AKERS, | |
| Appellant, | |
| and | |
| ESTATE OF BEVERLY AKERS and ESTATE OF JOHN A. AKERS, | |
| Defendants. | |

CHE, J. — John B. Akers appeals the trial court's grant of summary judgment for

American Pride Lending, LLC and American Pride Hospitality Group, Inc. (American Pride) and

final judgment awarding American Pride incidental damages and attorney fees.

American Pride sought specific performance of a purchase and sale agreement (PSA) for

the sale of properties by Beverly Akers, the Estate of John A. Akers, and John B. Akers

---

[†] On June 18, 2024, Mary Wynn and the Wynners Circle, Inc. were dismissed as parties on this
appeal.

(sellers).[1] The trial court granted summary judgment against sellers, requiring specific performance of the PSA. The trial court then awarded incidental damages and attorney fees to American Pride.

John B. argues the sellers' broker acted without authority, American Pride did not perform its duties under the PSA, and American Pride failed to satisfy the financing contingency and notice provision and could not waive it.[2] In addition, John B. assigns error to the award of attorney fees and requests attorney fees and costs on appeal.

We hold that there are no genuine issues of material fact, and American Pride is entitled to judgment as a matter of law. Further, the trial court did not err in awarding attorney fees.

Accordingly, we affirm the trial court's grant of summary judgment for American Pride and final judgment awarding American Pride attorney fees. We award American Pride attorney fees and costs on appeal, but we deny John B.'s request for attorney fees and costs on appeal.

FACTS

I. BACKGROUND

John A. and Beverly purchased three adjacent commercial parcels in 1992. Later, they gifted one of the parcels to their son, John B. John A. passed away in 2009, and Beverly became the personal representative for the Estate of John A. In 2017, Beverly and John B. listed for sale

---

[1] John A. passed away in 2009, and Beverly became the personal representative of John A.'s estate. Beverly passed away while this action was pending, and her estate substituted for her as a defendant. For simplicity, we will refer to parties by their first names.

[2] The Estates of John A. and Beverly also appealed. The personal representative of the two estates moved to dismiss their individual appeals, and the motion was granted on December 5, 2023. Ruling Dismissing Appeals, No. 58116-7-II, at 1 (Wash. Dec. 5, 2023).

all three properties with broker Mary Wynn. In December 2018, sellers accepted an offer by

American Pride, but the sale failed to close in early 2019.

On April 12, 2019, sellers drafted a new offer to sell the properties to American Pride.

Sellers listed American Pride as the buyer, designated Wynn as the listing broker, and signed it

on April 14 (April 14 PSA). Section 1 of the PSA provided that the purchase price was

$3.2 million payable as "[a]ll cash at closing contingent on new financing in accordance with the

[financing contingency]." Clerk's Papers (CP) at 139.

On April 23, American Pride signed the PSA but made handwritten modifications on

pages five and eight, initialed them, and drew lines for the sellers' initials.[3, 4] Later that night,

Wynn informed John B. and Shelley Akers-Lysdale, Beverly's "legal agent" and daughter,[5] of

---

[3] On April 22, American Pride's attorney e-mailed sellers' attorneys and raised two matters: (1) language in the PSA related to the assumption of leases and (2) American Pride's request for a $150,000 price reduction due to the loss it incurred from the incomplete PSA in December 2018. This e-mail was forwarded to Wynn, and on April 23, Wynn responded to American Pride's broker, stating (1) she had requested sellers to provide any leases for the properties and (2) a price reduction of $150,000 would "kill th[e] deal." Clerk's Papers (CP) at 1008. Wynn also stated that she had a backup cash offer buyer, which she had not yet communicated to the sellers.

[4] The changes stated that all tenants other than tow and fence companies must be off of the properties by closing and that American Pride may freely assign the PSA. *Compare* CP at 469 *with* CP at 493 (PSA stating the buyer "may," instead of "may not," assign the agreement).

[5] *See* CP at 2226 (Beverly's response to interrogatory describing Shelley as "Beverly Aker's legal agent" (Dec. 24, 2019)). Shelley communicated with Wynn on behalf of Beverly throughout much of the negotiation process but did not have the authority to sign any contracts for Beverly. The record contains no instrument, such as a power of attorney, granting Shelley power to act on behalf of Beverly. On February 28, 2019, Beverly revoked John B.'s power of attorney.

American Pride's changes to the PSA. Wynn considered Shelley and John B. to be Beverly's "mouth piece." CP at 176.

On April 25, Shelley texted Wynn twice, first stating, "On the advice of the banker's attorney, mother and [John B.] should not sign their addendums." "These buyers need to [sign] the [April 14 PSA] without their addendum. . . . The buyers should sign the [April 14 PSA] as it was when presented to them." CP at 179. Later that day, Shelley texted Wynn, stating, "Tell the buyers to sign the [April 14 PSA] or go away." CP at 167.

The next morning, on April 26, Wynn's office sent pages five and eight of the original, unmodified, April 14 PSA to American Pride without American Pride's changes.[6] American Pride initialed the pages and returned them. Wynn informed John B. that the parties "ha[d] mutual acceptance." CP at 1001. And Wynn's office sent the executed PSA to escrow and the closing agent, copying John B. and Shelley to the e-mail. American Pride timely deposited the required earnest money.

The PSA financing contingency provided that the "Buyer's obligations under the Agreement are contingent on Buyer obtaining new financing" and that the "Agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives notice that this condition is satisfied or waived on or before 55 days . . . following mutual acceptance of the Agreement." CP at 153.

The PSA notice provision stated that

[u]nless otherwise specified, any notice required or permitted in, or related to, [the PSA] . . . must be in writing. Notices to Seller must be signed by at least one Buyer

---

[6] Sellers were not included on the e-mail. See CP at 2023.

and must be delivered to Seller and Listing Broker with a courtesy copy to any other party identified as a recipient of notices in Section 28. A notice to Seller shall be deemed delivered only when received by Seller, Listing Broker, or the licensed office of Listing Broker.

CP at 145; PDF at 153.

Section 7 of the PSA provided, among other things, that closing will be on or before 60 days from mutual acceptance; parties shall deposit with the closing agent "all instruments and monies required to complete the purchase in accordance with [the PSA]" by 12:00 p.m. on the closing date; sale proceeds shall be considered available to sellers, even though they cannot be disbursed to sellers until the next business day after the closing date; the PSA is intended to constitute escrow instructions to the closing agent; and "Buyer and Seller will provide any supplemental instructions requested by [the closing agent] provided the same are consistent with [the PSA]." CP at 142.

American Pride's lender, Ready Capital, contacted escrow. On June 10, Ready Capital sent escrow an instruction letter, which indicated the loan amount and enclosed documents for execution.

On June 11, within 55 days of mutual acceptance, Ready Capital sent escrow a lender's commitment letter which stated that Ready Capital was granting American Pride the loan amount and would wire the net proceeds when "escrow [was] in a position to close." CP at 220. Escrow informed Wynn that Ready Capital had sent loan documents.

On June 13, Wynn's office e-mailed John B., notifying him that American Pride "already deposited all their portion of cash into escrow" and asking him if he wanted escrow to contact

Beverly to discuss any funding concerns. CP at 254. On June 27, Wynn forwarded her June 13

e-mail to John B., requesting he share that information with Beverly.

The closing agent provided supplemental closing and escrow instructions to the parties,[7]

which state, in pertinent part:

> Before the closing date, each party shall deposit with the closing agent all funds required to be paid by such party to close the transaction, less any earnest money previously deposited with the real estate agent. *The closing agent is authorized, but not required, to consider a lending institution's written commitment to deposit funds as the equivalent of a deposit of such funds*, if all conditions of the commitment will be met on or before the closing date.

CP at 372 (emphasis added).

On June 21, sellers refinanced their loan on the properties. On June 25, John A. and

American Pride executed an agreement to extend the closing date to June 28.

On June 24, American Pride signed the closing documents. Ready Capital informed

escrow that if the parties were still on schedule to close on June 26, it would send the funds on

the morning of June 26.

On June 25, American Pride deposited a down payment of $625,471.56 with escrow, and

escrow confirmed to Wynn that it had received American Pride's funds to close.[8]

---

[7] American Pride signed these supplemental instructions but sellers did not sign the supplemental instructions. *See* CP at 376.

[8] On the same day, Ready Capital e-mailed the closing agent, informing them that 5 of the 15 conditions listed in the lender's commitment letter were pending receipt. This e-mail was filed with the trial court on September 26, 2022, as part of the response to the third party defendant's motion for summary judgment.

On June 26, Beverly's attorney informed Wynn that Beverly would not sign any closing documents because there was no valid agreement to sell the properties to American Pride. Beverly claimed that when American Pride made handwritten changes to the PSA, this constituted a counteroffer and rejection of the original April 14 PSA, which she never accepted. American Pride responded that when Wynn sent pages five and eight of the unmodified April 14 PSA to American Pride on April 26, the sellers' offer was renewed. It further stated that both parties signed the PSA, making it an enforceable contract.

Section 21 of the PSA provided that "Buyer may . . . bring suit against Seller for Buyer's actual damages, [ ] bring suit to specifically enforce this Agreement and recover any incidental damages, or [ ] pursue any other rights or remedies available at law or equity." CP at 147. Section 21 also provided that "[i]f Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses." CP at 147.

## II. PROCEDURAL HISTORY

American Pride timely sued Beverly and John B., in their individual capacities, requesting specific performance of the PSA. Later, the trial court allowed the Estate of John A. to intervene.

A.    *Motions for Summary Judgment*

In March 2021, American Pride moved for partial summary judgment against Beverly and John B., seeking specific performance of the PSA. American Pride argued that it had performed its obligations under the PSA by depositing the down payment, acquiring the required

financing, providing evidence of the same to the closing and escrow agent, and otherwise signing and providing everything that was required of them. American Pride also argued that the sellers failed to perform under the PSA by refusing to close.

American Pride's loan officer declared that American Pride was approved for a loan; Ready Capital and escrow discussed the exact amount needed to close the sale; Ready Capital sent final loan documents to escrow, including a lender's commitment letter; and American Pride signed the closing documents. The "only reason Ready Capital did not wire the funds it had committed to loan to American Pride was that the sellers never signed the closing documents." CP at 265.

In response, sellers primarily argued that the PSA term "all monies required to complete the purchase" in section 7 could only mean the payment in cash of the entire purchase price referred to in section 1 of the PSA. CP at 415. Sellers claimed that American Pride failed to perform when it did not deposit the $3.2 million purchase price in cash at closing. Sellers also claimed that American Pride had not proven that it had obtained financing because the lender's commitment letter was insufficient for this purpose.

In April and June 2021, sellers also moved for summary judgment, arguing essentially the same matters raised in their response to American Pride's motion for summary judgment as well as other bases. The trial court denied sellers' motions for summary judgment.

In June, the trial court granted American Pride's motion for partial summary judgment against Beverly and John B. The trial court concluded that the only reason the sale did not close was that Beverly and John B. failed to perform their obligations under the PSA by failing to sign

the closing documents. The trial court also ruled, among other things, that Wynn acted with the sellers' authority when she e-mailed American Pride on April 26, 2019, asking it to initial pages five and eight of the unmodified April 14 PSA, that the PSA was an enforceable contract, and that American Pride timely performed all obligations under the PSA. Later, American Pride filed a summary judgment motion against the Estate of John A. The trial court granted summary judgment against the Estate of John A. and ordered specific performance of the PSA.

B.      *Bench Trial*

In January 2023, the parties proceeded to a bench trial on American Pride's claim for incidental damages. In its findings of fact and conclusions of law, the trial court awarded American Pride attorney fees of $344,058.64. Later, the trial court entered final judgment in favor of American Pride in the amount of $612,140.83.

John B. appeals the trial court's grant of summary judgment for American Pride and final judgment awarding American Pride incidental damages and attorney fees.

ANALYSIS

John B. argues Wynn lacked authority to resend the unmodified April 14 PSA on April 26, 2019, American Pride did not perform its duties under the PSA, and American Pride failed to

satisfy the financing contingency and notice provision and could not waive it.[9]  In addition,

John B. argues the trial court erred awarding attorney fees below[10] and requests attorney fees and

costs on appeal.

## I.  ISSUE PRESERVATION

As a preliminary issue, American Pride asserts that John B. did not preserve any errors

for appeal and asks this court to decline to consider John B.'s appeal.  We disagree and consider

the merits of John B.'s appeal.  We may refuse to review claims of error which were not raised in

the trial court.  RAP 2.5(a).  But under RAP 2.5(a)(3), "[a] party may raise a claim of error which

was not raised by the party in the trial court if another party on the same side of the case has

raised the claim of error in the trial court."  Because John B., Beverly, and the Estate of John A.

were defendants, they were on the same side of the case.  And John B. raises on appeal the same

arguments raised by the other defendants below.  Accordingly, John B. may raise claims of error

that he did not raise in the trial court but that Beverly or the Estate of John A. raised in the trial

court.  We consider the merits of John B.'s appeal below.

---

[9] John B. also argues that because Wynn acted unilaterally in "renewing" the sellers' offer, the trial court erred in granting Wynn's motion for summary judgment as to third parties because "the premise of the Court's order was erroneous."  Am. Br. of Appellant at 44.  We do not address this argument because John B. has conceded that he is not aggrieved as to Wynn and has agreed to Wynn's motion to dismiss the appeal related to the third-party claims.  John B. Akers' Resp. to Wynn's Mot. to Dismiss, No. 58116-7-II, at 2 (June 17, 2024); Ruling, No. 58116-7-II, at 2 (June 18, 2024).

[10] John B. also assigns error to the award of incidental fees, but he provides no argument on the assignment of error, so we do not consider the merits of that issue.  RAP 10.3(a)(6).

## II. VALIDITY OF CONTRACT

A.    *Legal Principles*

    i. *Standard of Review*

We review grants of summary judgment de novo. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fite v. Mudd*, 19 Wn. App. 2d 917, 926, 498 P.3d 538 (2021). We review the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 926. A genuine issue of material fact exists where reasonable minds could disagree on the facts controlling the outcome of the case. *Johnson v. Lake Cushman Maint. Co.*, 5 Wn. App. 2d 765, 778, 425 P.3d 560 (2018).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Sartin v. Estate of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020). A moving party can meet this burden by showing that the nonmoving party cannot support their claim with any evidence. *Id.* If the moving party does not satisfy its initial burden of proof, we deny summary judgment. *Welch v. Brand Insulations, Inc.*, 27 Wn. App. 2d 110, 115, 531 P.3d 265 (2023). If the moving party does satisfy its burden, the burden then shifts to the nonmoving party who must present specific facts that show a genuine issue of material fact. *Id.*

ii. *Actual and Apparent Authority*

An agent may have actual or apparent authority to bind the principal. *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994). An agent who exercises either type of authority binds the principal. *Smith v. Hansen*, 63 Wn. App. 355, 364, 818 P.2d 1127 (1991).

Actual authority may be express or implied. *Riveland*, 125 Wn.2d at 507. Both actual and apparent authority depend on the principal's objective manifestations. *Id*. With actual authority, the principal makes objective manifestations to the agent, and with apparent authority, the principal makes objective manifestations to a third person. *Id*. The principal's objective manifestations support a finding of apparent authority if (1) they cause the party claiming apparent authority to subjectively believe that the agent has authority to act for the principal and (2) they are such that the claimant's subjective belief is objectively reasonable. *Id*.

B.      *Wynn Had Actual and Apparent Authority to Resend Sellers' Offer with No Changes*

John B. argues that the trial court erred by granting summary judgment because Wynn acted unilaterally, without authority and without sellers' consent in resending sellers' [April 14] offer on April 26, 2019. We disagree with John B.

John B. primarily relies on *Larson v. Bear*, 38 Wn.2d 485, 230 P.2d 610 (1951). In *Larson*, our Supreme Court held that a real estate agent's authority was limited to finding a purchaser for a property according to the terms of the listing agreement and that the agent did not have authority to secure fuel oil and keep an oil burner operating in the house while they searched for a purchaser. *Id.* 490. The court stated in passing that real estate agents "do not have implied [actual] authority to make a contract of sale." *Id*. But *Larson* does not pertain to an

agent's authority to make an offer to sell a principal's property. Rather, *Larson* stands for the proposition that it is not within a real estate agent's authority to take on unusual or non-customary tasks, particularly when they are not included in the terms of the listing agreement. *See id.* at 490-91. Furthermore, the court in *Larson* explained that an agent may have apparent authority to bind the principal. *Id.* at 490.

Here, American Pride bore the initial burden to show that there was no genuine issue of material fact as to whether Wynn was authorized to resend pages five and eight of the unmodified April 14 PSA to American Pride on April 26. Sellers made an objective manifestation of Wynn's apparent authority when they designated Wynn as the listing broker on the PSA and signed it. This gave Wynn actual authority to act on behalf of the sellers. On April 25, Shelley, Beverly's "legal agent" made objective manifestations to Wynn in writing by stating (1) "buyers should sign the [April 14 PSA] as it was when presented to them" and (2) "[t]ell [American Pride] to sign the [April 14 PSA] or go away." CP at 167, 179 Thus, based on Shelley's instruction to Wynn, Wynn had actual authority to resend the sellers' original offer.

In addition, American Pride subjectively believed that Wynn had authority to act for the sellers, which was an objectively reasonable belief. *Riveland*, 125 Wn.2d at 507. Therefore, Wynn also had apparent authority to convey sellers' offers to sell the properties.

Thus, American Pride met its initial burden of showing that there was no genuine issue of material fact as to Wynn's authority to bind the sellers and that it was entitled to judgment as a matter of law.

The burden then shifted to John B. to either provide specific facts that revealed a genuine issue of material fact or show that American Pride was not entitled to judgment as a matter of law. He has failed to do so. Instead, John B. confuses the parties' burdens, asserting that American Pride has not presented evidence that Beverly designated Shelley as a "speaking agent."[11] Am. Br. of Appellant at 30. John B. does not put forth facts that create a genuine issue as to whether Shelley had authority as Beverly's "legal agent" to speak on Beverly's behalf. Rather, John B. disputes the meaning of Shelley's text to Wynn and claims that "Shelley's text did not instruct Wynn to 'renew' the seller's offer." Am. Br. of Appellant at 30. However, this is clearly not the case as Shelley's text states, "These buyers need to [sign] the [April 14 PSA] without their addendum. . . . The buyers should sign the [April 14 PSA] as it was when presented to them." CP at 179. And Shelley's subsequent text to Wynn stated, "Tell the buyers to sign the [April 14 PSA] or go away." CP at 167. These texts clearly state the sellers' position and direct Wynn to take action consistent with their stated position. John B. puts forth no winning arguments.

Even viewing the facts and drawing reasonable inferences in the light most favorable to John B., reasonable minds could not draw different conclusions as to whether Wynn had authority to resend the unmodified April 14 PSA. *Johnson*, 5 Wn. App. 2d at 778. American Pride is entitled to summary judgment as a matter of law on this issue.

---

[11] To the extent that Beverly was required to designate Shelley as her "speaking agent," as John B. contends, this requirement was necessarily met because Beverly listed Shelley as her "legal agent" in her responses to Wynn's first request for production and interrogatories to Beverly. Am. Br. of Appellant at 30.

B.    *The PSA is a Valid Contract*

John B. contends that no valid contract was formed because there was no offer nor meeting of the minds.  The premise of John B.'s contention is that Wynn lacked authority to send pages five and eight of the unmodified April 14 PSA to American Pride for signature on April 26, 2019.  In light of our decision above, we disagree.  This argument merits no further consideration.

III.  CONTRACT PERFORMANCE

John B. argues that the trial court erred by granting summary judgment because even if a contract was formed, American Pride failed to perform its contractual duties when it did not deposit the required funds according to the PSA.  Specifically, John B. contends that the PSA required American Pride to provide the full purchase price of $3.2 million in cash at closing.  We disagree with John B.

A.    *American Pride Deposited Funds Consistent With the PSA*

The material facts are not in dispute.  Section 1 of the PSA provided that the purchase price of $3.2 million was payable as "[a]ll cash at closing contingent on new financing in accordance with the [financing contingency]."  CP at 139.  Section 7 of the PSA provided, among other things, that sale proceeds shall be considered available to sellers, even though they cannot be disbursed to sellers until the next business day after the closing date and that "Buyer and Seller will provide any supplemental instructions requested by [the closing agent] provided the same are consistent with [the PSA]."  CP at 142.  In addition, on the closing date, American

Pride had deposited a total of $625,471.56 with escrow, and escrow confirmed to Wynn that it had received American Pride's funds to close.

Consistent with the PSA, the closing agent's supplemental instructions provided that it was "authorized, but not required, to *consider a lending institution's written commitment to deposit funds as the equivalent of a deposit of such funds*, if all conditions of the commitment will be met on or before the closing date." CP at 372 (emphasis added). Thus, the closing documents authorized the closing agent to consider Ready Capital's commitment letter as the equivalent of a deposit of funds, the closing agent considered it as a deposit of funds, and therefore, American Pride was not required to bring $3.2 million in cash at closing. American Pride was entitled to summary judgment as a matter of law on this issue.

B.      *American Pride Performed Its Duties Under the PSA*

"If a contract requires performance by both parties, the party claiming nonperformance of the other must establish as a matter of fact the party's own performance." *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986). We must first address "whether plaintiffs sufficiently performed under the agreement to claim nonperformance of defendants" and then address "whether the parties' duties were concurrent conditions or whether plaintiffs were waiting on a condition precedent." *Id.* at 394. Here, American Pride does not dispute that the parties were under concurrent duties to perform. Thus, the only issues are whether there is a genuine issue of material fact regarding American Pride's performance under the PSA and whether American Pride was entitled to judgment as a matter of law.

16

American Pride bore the initial burden to show that there was no genuine issue of material fact as to whether it performed under the PSA. The record at that time shows that American Pride was approved for a loan from Ready Capital; deposited the required earnest money; obtained financing from Ready Capital; sent final loan documents to escrow, including a lender commitment letter; and signed all closing documents. On the closing date, escrow confirmed to Wynn that it had received American Pride's funds to close. Thus, American Pride met its initial burden of showing that there was no genuine issue of material fact as to its performance under the PSA and that it was entitled to judgment as a matter of law.

The burden then shifted to John B. to provide specific facts that revealed a genuine issue of material fact, but he has failed to do so. John B. claims that American Pride did not obtain financing because it did not fulfill all the requirements of the lender's commitment letter. John B. relies on Ready Capital's e-mail informing the closing agent that 5 of the 15 conditions listed in the lender's commitment letter were pending receipt. But this e-mail was not part of the record at the time of the trial court's summary judgment ruling. Instead, it was an exhibit from a subsequent summary judgment motion regarding a third-party claim, which was submitted months after the trial court granted American Pride's motion for summary judgment. *See* CP at 1960. Thus, we do not consider this exhibit as it was not in the record before the trial court during the summary judgment proceeding against Beverly and John B. *Tacoma S. Hosp., LLC v. Nat'l Gen. Ins. Co.*, 19 Wn. App. 2d 210, 221, 494 P.3d 450 (2021) (stating that our scope of review in summary judgment proceedings is limited to the evidence and issues raised to the trial court before entry of the summary judgment order). Even reviewing the facts and drawing

reasonable inferences in the light most favorable to John B., reasonable minds could not draw different conclusions as to whether American Pride sufficiently performed. *Johnson*, 5 Wn. App. 2d at 778. Thus, American Pride is entitled to summary judgment as a matter of law on this issue.[12]

## IV. SATISFACTION OR WAIVER OF FINANCING CONTINGENCY

John B. argues the trial court erred by granting summary judgment because the financing contingency required American Pride to provide written notice to sellers of the satisfaction or waiver of the contingency in accordance with the PSA, the PSA terminated when American Pride did not do so, and American Pride could not waive the notice requirement in the PSA. We disagree with John B.

The financing contingency provided that the "Buyer's obligations under the Agreement are contingent on Buyer obtaining new financing" and that the "Agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives notice that this condition is satisfied or waived on or before 55 days . . . following mutual acceptance of the Agreement." CP at 153. The PSA stated that "[u]nless otherwise specified, any notice required or permitted in, or related to, [the PSA] . . . must be in writing," be signed by American Pride, and be delivered to sellers and Wynn. CP at 145.

In Washington, parties to a contract are generally required to follow contract notice provisions unless they are waived. *See Mike M. Johnson, Inc. v. County of Spokane*, 150 Wn.2d

---

[12] John B. contends that this case is like *Willener*, 107 Wn.2d 388 (1986), because neither party performed. In light of our decision that American Pride did perform its duties under the PSA, we need not consider John B's argument further.

375, 386, 78 P.3d 161 (2003). A party may waive a contract provision that is meant for its benefit and may imply waiver through its conduct. *Id.*

Contract provisions that are meant to benefit both the seller and buyer may still be waived. *Salvo v. Thatcher*, 128 Wn. App. 579, 586-87, 116 P.3d 1019 (2005) (holding that a financing contingency termination clause that allowed both the seller and buyer to terminate the PSA before the closing date did not require the buyer to give notice of his intent to terminate the PSA when he made good faith efforts to obtain financing but was unable to purchase the property on the closing date).

Waiver by conduct "'requires unequivocal acts of conduct evidencing an intent to waive.'" *Mike M. Johnson*, 150 Wn.2d at 386 (quoting *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 77 Wn. App. 137, 143, 890 P.2d 1071 (1995)). We must enforce procedural contract requirements "absent either a waiver by the benefiting party or an agreement between the parties to modify the contract." *Id.* at 386-87.

Here, American Pride bore the initial burden to show that there was no genuine issue of material fact as to whether it satisfied or waived the financing contingency. The record shows that American Pride timely obtained financing and notified, in writing, Wynn, sellers,[13] and escrow of the same, demonstrating its satisfaction of the contingency and notice provision. Indeed, John A. and American Pride executed an agreement to extend the closing date and sellers proceeded with the transaction as if the financing contingency had been satisfied or waived by

---

[13] American Pride, through e-mails from Wynn to John B., notified John B. and requested him to inform Beverly that American Pride had obtained financing.

19

refinancing their own mortgage on the properties immediately prior to the closing date. Thus, American Pride met its initial burden of showing that there was no genuine issue of material fact as to whether it satisfied or waived the financing contingency.

The burden then shifted to John B. to provide specific facts showing a genuine issue of material fact, but he has failed to do so. John B. asserts that American Pride did not obtain financing because it failed to deposit the required funds with escrow by the noon deadline on the closing date. But as discussed above, the record shows that Ready Capital sent escrow a commitment letter granting American Pride the loan required for the transaction. And escrow confirmed to Wynn that it had received American Pride's funds to close. Furthermore, the closing documents authorized the closing agent to consider Ready Capital's commitment letter as the equivalent of a deposit of funds, the closing agent considered it as a deposit of funds, and thus, American Pride was not required to bring $3.2 million in cash at closing as John B. contends. Even reviewing the facts and drawing reasonable inferences in the light most favorable to John B., reasonable minds could not draw different conclusions regarding whether American Pride satisfied the contingency by obtaining financing and providing written notice of the financing.

John B. nonetheless relies on *Mike M. Johnson* for the proposition that American Pride failed to satisfy the financing contingency clause when it did not provide written notice of the satisfaction or waiver of the contingency. While *Mike M. Johnson* provides that generally, parties to a contract are required to follow contract notice provisions, it also provides that if the provision benefits a party, it may be waived by the benefiting party. 150 Wn.2d at 386. Here,

20

the financing contingency benefited American Pride, so it could waive the provision through its conduct. *See id.* The financing contingency benefited American Pride because it allowed American Pride to terminate the PSA and receive back its earnest money if it could not obtain financing. *See Salvo*, 128 Wn. App. at 586. And even if the financing contingency benefited both the sellers and American Pride, American Pride was still permitted to waive it, though it did not need to because it satisfied the contingency. *See Salvo*, 128 Wn. App. at 586-87.

Next, John B. contends that American Pride cannot waive the financing contingency, citing a footnote in an unpublished decision, *CRJ Kim, Inc. v. JKI Inv., Inc.*, No. 48566-4-II, slip op. at 21 n.7 (Wash. Ct. App. March 14, 2017) (unpublished).[14]

In *CRJ Kim*, parties entered into a commercial real estate PSA with a financing contingency, which stated that the buyer's obligations under the PSA were contingent on the buyer obtaining new financing and that the buyer was required to give notice that the contingency was satisfied or waived by a particular date. *Id.* at 4. The buyer did not provide notice before the agreed date and did not obtain final approval for financing until over two weeks after the agreed date. *Id*. at 5. The seller notified the buyer that it considered the PSA to be terminated. *Id.* The parties continued to exchange e-mails and provide documents described in the PSA after the financing notice deadline had passed. *Id*. at 18-19. The buyer then filed a lawsuit to compel the seller's performance under the PSA and to recover incidental damages. *Id*.

---

[14] https://www.courts.wa.gov/opinions/pdf/D2%2048566-4-II%20Unpublished%20Opinion.pdf (stating that "the financing notice provision technically was for [the buyer's] benefit because it could terminate the contract if it did not obtain financing. But the 60-day deadline, which is what [the buyer] claims that [the seller] waived, was solely for [the seller's] benefit.").

at 6. The trial court granted the buyer specific performance of the PSA on summary judgment, ruling that even if the notice deadline applied, the seller waived that deadline by its conduct after the deadline. *Id*. at 6-7.

On appeal, this court reversed summary judgment, holding that the notice requirement within the financing contingency applied because "a contract party's conduct cannot operate as a waiver of a termination clause *after* the contract already has terminated by its terms." *Id*. at 20 (emphasis added). This court also held that only the seller's conduct *before* the PSA terminated could constitute a waiver. *Id*. at 24.

*CRJ Kim* is inapposite. Though the notice requirement deadline in a financing contingency may benefit the seller, unlike in *CRJ Kim*, here, there is no claim that the 55-day deadline was waived. Instead, American Pride contends that it satisfied the financing contingency and notice provision by obtaining financing and providing written notice of its performance within the 55-day window, and that if it did not perfectly perform, it nonetheless waived the contingency through its conduct. Moreover, as discussed above, the record shows that American Pride timely obtained financing and provided notice of the same.

Thus, there is no genuine issue of material fact regarding whether American Pride satisfied or waived the financing contingency through its conduct, and American Pride was entitled to summary judgment as a matter of law on this issue.

ATTORNEY FEES

John B. argues the trial court erred awarding attorney fees below, and both parties request attorney fees on appeal. We disagree with John B. as it relates to attorney fees below and on appeal, and we grant attorney fees to American Pride on appeal.

We will not disturb the trial court's discretionary awards of attorney fees unless the court abused its discretion. *Eagle Point Condo. Owners Ass'n v. Coy*, 102 Wn. App. 697, 715, 9 P.3d 898 (2000). Under RAP 18.1(a), this court may award a party its reasonable attorneys' fees if an applicable law grants a party the right to recover them. Under RCW 4.84.330, where a contract includes a provision that awards attorney fees and costs incurred to enforce the contract shall be awarded, the prevailing party is entitled to reasonable attorney fees and costs. The PSA provides that "[i]f Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses." CP at 147. Because American Pride is the prevailing party below and on appeal, it is entitled to reasonable attorney fees and costs incurred at the trial level and on appeal. Thus, the trial court did not err awarding attorney fees below and American Pride is entitled to fees on appeal. We deny John B.'s request for attorney fees and costs on appeal.

CONCLUSION

We hold that there are no genuine issues of material fact, and American Pride is entitled to judgment as a matter of law. Further, the trial court did not err in awarding attorney fees below.

Accordingly, we affirm the trial court's grant of summary judgment for American Pride and final judgment awarding American Pride attorney fees. We award American Pride attorney fees and costs on appeal but deny John B.'s request for attorney fees and costs on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Cruser, C.J.

Price, J.